IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

────────────

**STATE OF ARIZONA**,
*Appellee,*

*v.*

**CHRIS THOMAS GOMEZ**
*Appellant.*

────────────

No. CR-19-0292-PR
Filed March 9, 2021

────────────

Appeal from the Superior Court in Pima County
The Honorable Bryan B. Chambers, Judge
No. CR20163385-001

Memorandum Decision of the Court of Appeals
Division Two
No. 2 CA-CR 18-0052
Filed August 8, 2019
**VACATED AND REMANDED**

────────────

COUNSEL:

Mark Brnovich, Arizona Attorney General, Brunn (Beau) W. Roysden III, Solicitor General, Linley Wilson, Chief Counsel, Phoenix, Kathryn A. Damstra (argued), Assistant Attorney, Criminal Appeals Section, Tucson, Attorneys for State of Arizona

Richard C. Bock, Law Office of Richard C. Bock, Harley D. Kurlander (argued), Law Office of Harley Kurlander, Tucson, Attorneys for Appellant

Daniel A. Arellano, Ballard Spahr, LLP, Phoenix, Yalda Godusi, Lewis Roca Rothgerber & Christie, LLP, Phoenix, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

_____

JUSTICE BOLICK authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES GOULD, LOPEZ, BEENE, and MONTGOMERY joined.

_____

JUSTICE BOLICK, opinion of the Court:

¶1        Defendant Chris Gomez was convicted of sexual assault.  The court of appeals reversed the conviction on the ground that DNA evidence was improperly admitted because it was insufficient to identify anyone and was therefore unfairly prejudicial.  As the evidence was not used to establish identity but to demonstrate that a man other than the victim's husband touched the victim's genitals, we hold it was properly admitted and therefore vacate the court of appeals' decision.  We remand the case to that court to consider an unresolved issue.

**BACKGROUND**

¶2        Early one morning in July 2016, the victim, J.B., was driving for Uber and picked up Gomez, who had requested a ride.  Gomez sat in the front passenger seat as J.B. drove him to an apartment complex.  According to J.B., as they were completing the trip, Gomez grabbed her wrist, pulled her toward him, and restrained her.  Gomez pushed her bra and dress down, and kissed her face, neck, and breast.  J.B. told him to stop and scratched him, to no avail.  Gomez pulled up her dress and put his fingers in her vagina.  She managed to push him away and get out of the van.  J.B. demanded that Gomez leave the van, and after trying to coax her back inside, he complied.  As Gomez walked toward her, J.B. got back inside the van and locked the doors.  Gomez started knocking on the window, telling J.B. he wanted to talk about what happened, but she drove off.

¶3        J.B. called her husband, R.R., and told him what had happened. He told her to go somewhere safe, and she drove to a gas station, where she called 911.  After J.B. spoke to responding officers, she went to a nearby hospital, where nurses performed a sexual assault examination,

collecting DNA samples from her face, neck, chest, breasts, fingernails, vagina, and external genital areas.

¶4          Uber identified Gomez as the passenger.  Gomez also messaged J.B. through the Uber application, saying, "Sorry about all that. Way out of line."  However, during Gomez's initial interview with the police, he contended that "nothing happened" and he "never touched" J.B. A grand jury indicted Gomez on one count of sexual assault for "placing his finger(s) in her vagina."

¶5          A DNA analyst matched Gomez's DNA profile with samples taken from J.B.'s face, neck, chest, and breasts but could neither include nor exclude Gomez as a contributor to the DNA found under J.B.'s fingernails. Using a Y-STR (short tandem repeat) technique, the analyst examined DNA samples from J.B.'s vagina and external genitals for Y (male) chromosomes. Those tests found a "full profile" for R.R., with whom J.B. confirmed she had sex earlier in the day.  On the external genital swabs, the analyst also found a minor DNA profile, consisting of "two additional male DNA markers or . . . [a]lleles" that were contained in Gomez's DNA profile.[1] Because there were only two markers and the rest of the minor DNA profile was absent, the analyst could not match the DNA to any particular person's profile but was able to conclude that it belonged to a male who was not R.R. Thus, the minor Y-DNA profile on the external genital swabs was "inconclusive" as to the contributor's identity.

¶6          Before trial, Gomez filed a motion in limine to preclude any testimony about the minor Y-DNA profile on the external genital swabs. He argued the evidence was inadmissible under Arizona Rules of Evidence 401 and 702, contending that it was irrelevant because it was insufficient to identify Gomez or to run a statistical probability and could confuse the jury. The trial judge (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)) found that Gomez "would not be prejudiced by the jury hearing an inconclusive DNA result.  The DNA results pass *Daubert* and the Court takes note of defense counsel's argument as to relevancy; however, precluding this specific DNA result from the jury may cause the jury to speculate."  Thus, the court ruled the evidence admissible, subject to cross-

---

[1] "DNA's component parts include base pairs that determine genetic traits, called alleles."  *State v. Bigger*, 227 Ariz. 196, 206 ¶ 33 n.17 (App. 2011).

examination, but precluded the State from arguing that "this particular result of the DNA test shows that [Gomez's] DNA was there." The court added that if the State "infer[s] anything more than that, there might be a curative instruction."

¶7            During trial, Gomez testified that when he and J.B. arrived at the apartment complex, they continued talking and he kissed her lips, neck, chest, and breasts, all of which was consensual. She then pulled away and told him that she was in a relationship. Gomez specifically denied that he placed his fingers in J.B.'s vagina or did anything that was not consensual.

¶8            The DNA analyst testified at trial that the major Y-DNA profile matched R.R. She also testified about the minor Y-DNA profile, stating that the two markers were insufficient to make any sort of comparison and were therefore inconclusive. Gomez objected, arguing that the State was drawing an inference that the court had forbidden in response to the motion in limine. The objection was overruled. The analyst then testified that the two alleles were within Gomez's profile but that they were insufficient for identification and therefore inconclusive. The analyst had earlier testified that the markers could belong to any male other than R.R.[2]

¶9            During closing argument, the State noted that there were two DNA "outliers" on J.B.'s external genitals that belonged to a male other than R.R. The State acknowledged that they were inconclusive as to identity and that only J.B. could identify who left the DNA there. Gomez requested a mistrial based on that part of the closing argument, which the court denied. The jury convicted Gomez as charged and he was sentenced to 5.75 years in prison.

¶10          A divided court of appeals reversed. The majority concluded that the minor Y-DNA evidence offered during trial was relevant under Rule 401. *State v. Gomez*, No. 2 CA-CR 2018-0052, 2019 WL 3761642, at *6

---

[2] Presumably some other males, in addition to R.R., lack the same two alleles. However, the State did not make this point, as it did not use the alleles to identify Gomez as the perpetrator.

¶¶ 27–28 (Ariz. App. Aug. 08, 2019) (mem. decision).[3] The court also found that the analyst's expert testimony was "helpful," as it "bore on the question of Gomez's guilt—albeit circumstantially." *Id.* ¶ 29. But the majority was concerned that "the analyst could not provide any statistical data regarding the number of people who would have had those two alleles in their profile." *Id.* at *7 ¶ 33. Thus, the majority concluded that "the minimal probative value of the evidence concerning the matching two alleles was substantially outweighed by a danger of unfair prejudice and confusion" and was therefore inadmissible under Rule 403. *Id.* at *8 ¶ 34 (citing Ariz. R. Evid. 403). Because the error was not harmless, the court reversed Gomez's conviction and sentence. *Id.* at *10 ¶ 44.

¶11        Agreeing with the majority that the evidence was relevant, the dissent observed that "[w]e ought to be loath to find prejudice when the trial court, much closer to the question, found none." *Id.* at *12 ¶ 51 (Brearcliffe, J., dissenting). The dissent concluded that "there was no risk of confusion under Rule 403 that could not be ameliorated by cross-examination. Further, the court expressly barred the state from raising any inference that the testing positively identified the minor Y-DNA evidence as Gomez's DNA, and the state did not do so." *Id.* ¶ 52.

¶12        We granted review on the question of whether the trial court committed reversible error by admitting expert testimony that inconclusive DNA evidence found on the victim had two alleles also present in the defendant's DNA profile. The use of DNA evidence in criminal prosecutions is a recurring issue of statewide concern. We have jurisdiction under article 6, section 5 of the Arizona Constitution and A.R.S. § 13-4036.

## DISCUSSION

¶13        We review a trial court's decision whether to admit DNA evidence for an abuse of discretion and in the light most favorable to

---

[3] Because the court reversed the conviction based on improper trial testimony, it did not reach the dispute over closing arguments. *Id.* at *3 ¶ 15 n.4. For the sake of finality, and because the issues are essentially the same and the parties argued them in their entirety, our decision encompasses the closing arguments, so there is no need for remand on this issue.

sustaining its ruling. *State v. Escalante-Orozco*, 241 Ariz. 254, 273 ¶ 44 (2017), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018). We review interpretation and application of our evidence rules de novo. *State v. Fitzgerald*, 232 Ariz. 208, 210 ¶ 10 (2013).

¶14 Rule 403 provides in pertinent part: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Ariz. R. Evid. 403. One verb and one adverb in that provision are especially important to our analysis. First, if the standard is met, the court "may" exclude relevant evidence. The term "may" indicates discretion. *State v. Lewis*, 224 Ariz. 512, 515 ¶ 17 (App. 2010), *aff'd*, 226 Ariz. 124 (2011); *In re Marquardt*, 161 Ariz. 206, 210 (1989). Second, the relevant evidence may be excluded if its probative value is "substantially" outweighed by one of the listed dangers.

¶15 The conditions of admission of DNA evidence and expert testimony, particularly from the standpoint of Rule 403 prejudice, are necessarily fact-specific and dependent upon the context of the case. That is why we rely so heavily upon, and defer so extensively to, the discretion of the trial court, which is in a far better position than an appellate court to weigh potential prejudice in the overall context of the case. *See, e.g.*, *State v. Rodriguez*, 186 Ariz. 240, 250 (1996).

¶16 In this case, the DNA evidence was not used to establish identity. Gomez's own testimony, along with a host of other evidence, established that Gomez was in the front seat of the vehicle with J.B. and kissed her face, neck, chest, and breasts. An essential element in determining whether sexual assault was committed was whether Gomez touched her genitals, which the State alleged and Gomez denied. Under those circumstances, DNA evidence that only established that a man other than J.B.'s husband touched her genitals was probative on that issue, and indeed the court of appeals properly concluded both that the evidence was relevant and that the expert's testimony was helpful. *Gomez*, 2019 WL 3761642, at *6 ¶¶ 27–29.

¶17 The trial judge carefully circumscribed how the evidence could be presented such that it would not prejudice the defendant or confuse or mislead the jury by suggesting more than the DNA sample could

demonstrate. Specifically, he ruled that "the State is not permitted to argue to the jury that this particular result of the test show[s] that the Defendant's DNA was present." The judge further provided that if the State went beyond that, Gomez could cross-examine the expert witness and present contrary evidence, and that the court would provide a curative jury instruction if necessary.

¶18 The prosecutor and expert witness adhered scrupulously to those boundaries. The witness repeatedly testified that the results were "inconclusive," meaning they could not be used at all to identify anyone. Although she indicated that the minor Y-DNA profile was consistent with Gomez's, she did not suggest there was a DNA "match," nor, as the court of appeals observed, *Gomez*, 2019 WL 3761642, at *5 ¶ 22 & n.6, did she testify that Gomez was "not excluded" as a DNA contributor. *See, e.g.*, *State v. Johnson*, 247 Ariz. 166, 200–01 ¶¶ 134–37 (2019) (holding that the term "match" may be used where a very strong statistical probability links defendant to DNA found at a crime scene); *Escalante-Orozco*, 241 Ariz. at 274 ¶¶ 49–50 (allowing the terms "not excluded" and "match" so long as they are not "likely to mislead jurors to believe [defendant] was the source of the profile rather than a possible source").

¶19 In closing argument, the prosecutor emphasized the limited yet crucial role played by the DNA evidence. She noted that the major DNA contributor was J.B.'s husband. As to the minor Y-DNA sample, the prosecutor stated it "is inconclusive for comparison purposes. There is not enough for [the expert] to say and there never will be." She then explained, "What does inconclusive mean? What did [the expert] tell us? You can't say anything about it. You can't say whether someone's included or excluded. There's simply not enough." Moreover, the prosecutor noted that in cross-examination, defense counsel asked the expert, "[S]o it could be anyone in the world and we just don't know? She said, yeah, it's true. But when we look at the evidence in this case, who can tell us who the other male was?"

¶20 At that point, the defendant requested a mistrial. After that was denied, the prosecutor summed up the point of the DNA evidence. "[T]he one person who can tell us the other male DNA that's present on her external genitalia swab was [J.B.]," she argued. "It's not the DNA evidence because that's inconclusive. But you don't have to take things in a vacuum

7

when you decide this case. You decide this case based on the totality of the circumstances, absolutely everything you've heard in this courtroom."

**¶21** The court of appeals divided the minor Y-DNA evidence into two categories. It concluded that the "minor Y-DNA profile on the external genital swabs was probative evidence showing that another male had touched J.B." and could not "say the trial court clearly abused its discretion by concluding the probative value of that part of the DNA evidence was [not] substantially outweighed by a danger of unfair prejudice or misleading the jury." *Gomez*, 2019 WL 3761642, at *7 ¶ 31.

**¶22** However, the court decided that the testimony "concerning the two alleles found in the minor Y-DNA profile and Gomez's profile" was excessively prejudicial or confusing for two distinct but related reasons. *Id.* at *7–8 ¶¶ 32, 34. First, "testing of the external genital swabs established an 'inconclusive' minor Y-DNA profile, yet the analyst stated that the two alleles from the minor profile were consistent with Gomez's profile in terms of their numbers and locations." *Id.* at *7 ¶ 33. Second, "the analyst could not provide any statistical data regarding the number of people who would have had those two alleles in their profile," thus rendering the allele testimony inadmissible under Rule 403. *Id.*

**¶23** The court based its holding that such evidence was insufficiently probative and excessively prejudicial on *State v. Fulminante*, 193 Ariz. 485 (1999). *Gomez*, 2019 WL 3761642, at *7 ¶ 32. In *Fulminante*, the Court excluded on Rule 403 grounds inconclusive DNA evidence that the expert concluded was negative as to whether a sexual assault had been committed. The Court reasoned that "[i]f the state's expert was forthright enough to say that the findings were so inconclusive he had to reach a negative conclusion, then admitting the evidence so that the jury could reach a different conclusion merely invited the jury to speculate and posed a serious threat of misleading." *Fulminante*, 193 Ariz. at 504 ¶ 67.

**¶24** We disagree with the court of appeals' approach. First, contrary to its analysis, the State did not separate the minor Y-DNA profile genital swab evidence from the alleles but rather presented the evidence as a coherent whole, establishing the sole fact that a male other than J.B.'s husband had touched her genitals. The evidence was only used to exclude R.R., not to identify any possible individuals who might have left the alleles.

8

¶25        Moreover, *Fulminante* is inapposite because it involved a murder in which sexual assault was *not* charged; hence, the DNA evidence was not probative. *Id.* And unlike *Fulminante*, here the DNA evidence and the expert's testimony were not inconsistent. To the contrary, as the expert and prosecutor repeatedly emphasized, the inconclusive DNA evidence could have come from any male other than R.R. The alleles could not establish, or even imply, the identity of the DNA contributor; that could only come from J.B.'s testimony and circumstantial evidence.

¶26        We reject for similar reasons the court of appeals' reasoning that the allele testimony was inadmissible under Rule 403 because it was not accompanied by statistical evidence showing the likelihood that Gomez was the DNA source. All the cases cited in support of this proposition by Gomez and the court of appeals involve the use of DNA to identify a suspect, which is markedly different from the limited purpose for which the allele testimony was presented here.

¶27        The court of appeals acknowledged that this Court "has suggested that statistical evidence is not always necessary in quantifying DNA results." *Gomez*, 2019 WL 3761642, at *5 ¶ 24 (citing *State v. Boles*, 188 Ariz. 129, 132 (1997) and *State v. Hummert*, 188 Ariz. 119, 124 (1997) for the proposition that expert DNA testimony may be supported by personal experience). Despite those rulings, however, the court of appeals concluded such statistics were required here, noting that other jurisdictions have required statistical analysis as a prerequisite for presenting DNA evidence. *Id.* at *6 ¶ 25 (citing *People v. Coy*, 620 N.W.2d 888, 899 (Mich. Ct. App. 2000)).

¶28        But when a sample is inconclusive, the expert cannot quantify the likelihood that it matches a specific person. *State v. Bander*, 208 P.3d 1242, 1245 ¶ 9 (Wash. Ct. App. 2009). Had the expert been required to present statistical probability, presumably she would have had to testify that, by the inconclusive allele evidence alone, there was an incalculable possibility that the DNA belonged to Gomez. A categorical rule that statistical probabilities are necessary to introduce DNA evidence would therefore necessarily preclude the use of inconclusive DNA evidence altogether.

**¶29** This Court has emphasized that "there is no single or specific scientific method" of introducing DNA evidence, "but, rather, different ways of explaining the significance in a forensic setting." *Hummert*, 188 Ariz. at 124. Depending on the totality of the circumstances, it is permissible to use DNA evidence in a carefully limited way when "the jury [can] readily understand th[e] limitation." *Escalante-Orozco*, 241 Ariz. at 273–74 ¶ 48.

**¶30** *Coy* and other cases that require a showing of statistical probability as a prerequisite for introducing DNA evidence involve the use of such evidence to show that it is likely that the defendant committed the crime. Here, in stark contrast, the DNA evidence was not used to prove *identity* but a *fact*: specifically, that a crime was committed. Indeed, the expert could only identify one man, R.R., as not being the person who touched J.B.'s genitals. But with this limited use of the allele evidence to demonstrate that a man other than her husband touched J.B.'s genitals, the State was able to corroborate J.B.'s testimony (and discredit Gomez's), showing circumstantially that it was more likely that the man who was in the car and who kissed and touched her also placed his fingers in her vagina.

**¶31** Put another way, the State did not need the allele evidence to identify Gomez. That evidence did not show that Gomez was the person who touched J.B.'s genitals. Instead, the prosecutor emphasized in closing argument that the identity of the man who left the DNA on J.B.'s genitals would have to be determined from other evidence. The DNA evidence corroborates J.B.'s testimony that Gomez touched her genitals.

**¶32** This limited use of inconclusive DNA evidence to establish that a crime occurred does not raise the concerns implicated by Rule 403. Its probative value for the limited purpose is high. *See Gomez*, 2019 WL 3761642, at *12 ¶ 54 (Brearcliffe, J., dissenting) (evidence consisted of "confirmed male DNA which, in part, matched Gomez, but did not match her [husband], and was where, in essence, the victim said it would be"). That limited use also reduces its prejudicial impact, because the DNA evidence is used only to show that someone other than R.R. touched J.B.'s genitals. If the allele evidence was the only proof the State had that Gomez sexually assaulted J.B., he would go free. Gomez's identity had to be established by other evidence. At the same time, without the allele

evidence, which the court of appeals correctly held was competent to establish that a sexual assault occurred, the case largely would come down to a he-said, she-said dispute. And as the trial court observed, jurors would have had to speculate about whether DNA evidence existed that J.B.'s genitals were touched.

¶33 Given the careful presentation of the testimony, the opportunity for cross-examination, and the State's characterization of the testimony during closing argument, the evidence was neither unfairly prejudicial to Gomez nor confusing to the jury. *See Escalante-Orozco*, 241 Ariz. at 275 ¶ 59 (no Rule 403 violation because the "jury could understand the limited probative value of the DNA evidence without danger of confusion"). The State was entitled to present as full a picture as possible without exaggerating or drawing undue conclusions. When "an expert's scientific testimony rests upon good grounds, . . . it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *State v. Bernstein*, 237 Ariz. 226, 230 ¶ 18 (2015) (citation omitted) (internal quotation marks omitted).

¶34 It was certainly within the trial court's broad discretion to admit the allele testimony for the specified limited purpose of showing that a crime occurred. The court carefully circumscribed the testimony to that purpose, and the prosecutor hewed to that purpose in her closing remarks. We find no error.

## DISPOSITION

¶35 The court of appeals did not resolve the issue of whether a detective's response to a question at trial constituted fundamental error. *Gomez*, 2019 WL 3761642, at *10 ¶ 44 n.10. We therefore remand to that court to resolve this remaining issue and otherwise vacate its memorandum decision.