NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

THOMAS ALLEN DANIEL, *Appellant.*

No. 1 CA-CR 21-0356
FILED 10-06-2022

---

Appeal from the Superior Court in La Paz County
No. S1500CR201600165
The Honorable Matthew G. Newman, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Carr Law Office PLLC, Kingman
By Sandra Carr
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding Judge Brian Y. Furuya and Judge Jennifer B. Campbell joined.

---

**M c M U R D I E**, Judge:

¶1        Thomas Allen Daniel appeals from his convictions and sentences for second-degree murder and arson of an occupied structure. He argues that the superior court failed to enforce its rulings to exclude irrelevant and inflammatory personal information. He also claims the State engaged in intentional misconduct and that two instances of jury misconduct denied him a fair trial. Finally, he argues the court failed to limit or preclude highly prejudicial DNA evidence and erred by denying his Rule 20 and Rule 24.1 motions based on the insufficiency of the evidence. We find no reversible error and affirm.

**FACTS[1] AND PROCEDURAL BACKGROUND**

¶2        On August 23, 2012, the Quartzsite Fire Department received a 9-1-1 call at 8:40 p.m. about a trailer on fire in a trailer park. Firefighters arrived at the scene at 8:46 p.m. and extinguished the fire within six minutes. They searched the trailer and found Lucy's[2] body on the bathroom floor. Firefighters wrapped a blanket around her and carried her body outside. Meanwhile, one of Lucy's neighbors stepped outside to see what was happening and saw a white man "who appeared to be in a hurry" walking away from Lucy's trailer. The neighbor could not see the man's face, but she believed the man was five feet and ten inches tall, "with a normal to thin build . . . in his 30s or younger." The man wore a black shirt, jeans, and a baseball cap that hid his hair color.

¶3        A forensic pathologist conducted an autopsy on Lucy's body and determined that Lucy had suffered nine stab wounds and "died as a result of multiple sharp force injuries." The pathologist also concluded that

---

[1]        We view the facts in the light most favorable to sustaining the judgment. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

[2]        We use a pseudonym to protect the victim's identity.

the wounds were likely caused by a knife or "a cutting object." She identified three superficial wounds on Lucy's right forearm that "fall under [the] category of defense injuries" because victims often try to defend themselves with their arms. The pathologist swabbed Lucy's fingers, scraped underneath her fingernails, clipped her fingernails, and sent the samples to the lab for DNA testing. The pathologist also concluded that Lucy died before any smoke or fire reached her.

¶4        The fire chief's arson investigation revealed that someone had set the fire intentionally.

¶5        In search of a lead, detectives began interviewing Lucy's neighbors, friends, and family. One detective spoke with Lucy's son's girlfriend, Betty Vanderford. He learned that Vanderford and Lucy usually talked over the phone several times a week, and around 7:00 p.m. on August 23, 2012, Vanderford called Lucy. Lucy did not answer but returned Vanderford's call, and they spoke for about 15 minutes. About halfway through the call, Lucy told Vanderford that someone was knocking on her door. Lucy did not seem concerned, but she did not answer the door and said, "I hope it's not her." The knocking continued, and eventually, Vanderford "could hear the banging" over the phone. Lucy said, "I hope it's not them," and told Vanderford that she might pretend she was in the shower as an excuse for not hearing the knocking. Vanderford could still hear the banging when they hung up at 7:09 p.m.

¶6        A detective also spoke with Lucy's friend, Clara Watanabe, who was near Lucy's trailer the night of the fire. The detective collected a DNA sample from Watanabe. Watanabe gave the detective the names of people she thought may have been in contact with Lucy, including two men and a woman named Julie Bottelsen.

¶7        Watanabe described Bottelsen as Lucy's friend but contended that Bottelsen "was taking advantage of [Lucy]" because Lucy would give her rides, food, and money. Watanabe thought Lucy "was kind of afraid of Julie Bottelsen" and was trying to distance herself from her. Because of Vanderford's statement that Lucy had said, "I hope it's not her," detectives focused their initial investigation on female suspects. Bottelsen became a person of interest.

¶8        Shortly after, two detectives saw Bottelsen in a restaurant parking lot. They approached her, and she agreed to be interviewed. She willingly provided a DNA sample and turned over a knife she had been carrying. The knife was later tested for blood, but none was found.

¶9        In October 2013, detectives received a call from the crime lab's DNA analyst updating them on the DNA test results from the samples obtained during the autopsy. The results revealed Lucy's DNA mixed with one "partial unidentified male DNA profile." Based on this information, the investigators shifted their focus to male suspects but understood that they could not rule out females entirely.

¶10        The same month, detectives obtained Lucy's phone records for August 2012. When a detective reviewed the records for the day of the homicide, he noticed that they corroborated Vanderford's statements about her call with Lucy. But the detective also saw another call at 7:26 p.m., just over an hour before the fire. It stood out to the detective because it came from a number that did not appear elsewhere in the August 2012 records. The detective learned that the number belonged to Daniel, who became a suspect for the first time during the investigation. The detective then obtained Daniel's phone records, which confirmed the call to Lucy and showed another call made to a local gas station at 7:16 p.m. the same day.

¶11        The detective contacted Daniel at his home, where he lived with his fiancée in a trailer park near Lucy's trailer park. Daniel stated he knew Lucy because they had worked together at a local gas station and that sometimes he and his fiancée would smoke with Lucy on her porch and talk about their day. Daniel denied calling Lucy on the evening of her death. But the detective learned the first call was to the same gas station where Daniel had worked with Lucy. Although Daniel had not worked there for a few years, Lucy still worked there at the time of her death.

¶12        The detective asked Daniel for a DNA sample, and Daniel willingly complied. By the end of the month, detectives had collected DNA samples from eight men, including Daniel.

¶13        In November 2014, detectives received another call from the crime lab reporting more DNA results. The male samples had been compared to the profile obtained from the autopsy swabs and fingernail clippings. Based on these comparisons, the DNA analyst could exclude seven of the eight men as contributors to the DNA found on Lucy's body, but she could not exclude Daniel.

¶14        In May 2015, police arrested Daniel. They interviewed him again and asked where he was during Lucy's murder, and he claimed he was working an overnight shift that started at either 10:00 or 11:00 p.m. Police later obtained work records that showed Daniel had clocked in that night at 10:41 p.m.

¶15 A grand jury indicted Daniel for first-degree murder and arson of an occupied structure. The case proceeded to trial, and the jury acquitted Daniel on the first-degree murder charge but could not decide on the lesser included offense of second-degree murder or the arson charge. The State elected to retry Daniel for second-degree murder and arson of an occupied structure.

¶16 Before the start of the second trial, Daniel filed a motion *in limine* to exclude personal information about him and his fiancée. The superior court ruled as inadmissible testimony that Daniel's fiancée left her disabled ex-husband for Daniel after he moved in with them as a roommate. The court later clarified that the State was not to ask about the prior marriage.

¶17 Daniel also moved to exclude testimony by the DNA analyst. The court ruled that the testimony would be allowed generally, but the analyst could not testify that the DNA conclusively identified Daniel. Our supreme court later issued *State v. Gomez*, 250 Ariz. 518 (2021), which related to the admittance of DNA evidence, and the superior court asked the parties to address its impact on this case. After considering the arguments, the court ruled that "[t]he experts the State has called are entitled to give their expert opinion and explain that opinion in the terms that they use to do that." The court held that the evidence is probative, and it did not "see any [Rule] 403 issues," adding that it did not foresee any more jury confusion than expected "in any case with scientific evidence."

¶18 The case proceeded to jury selection, and the prospective jurors were told that Daniel was charged with causing Lucy's death. One prospective juror asked to be dismissed because he knew Lucy, and the court obliged. Another prospective juror said he knew something about the case and was excused. Daniel objected to passing the rest of the panel for cause, but the court denied the motion.

¶19 During the State's case-in-chief, the prosecution called the DNA analyst who performed the DNA tests. The analyst testified that she compared the profile of the male DNA found under Lucy's fingernails to the eight male DNA profiles she received from the police. Seven of the eight profiles did not match, so those individuals could be excluded. But Daniel's profile matched in a way that "Daniel and all of his paternally-related male relatives [could ]not be excluded." The analyst also explained that she calculated a "likelihood ratio" that revealed she would be more likely to see the obtained DNA mixture if it came from Lucy and Daniel than from Lucy and other "random" individuals.

¶20 Later, the analyst explained how DNA might end up underneath someone's fingernails. She stated that it "is possible" to transfer DNA via an accidental scratch, but it likely "would take more than just a . . . casual touch." She added that "[i]n a normal setting with hand washing and manipulating other things with the hands," it would be unlikely that DNA would remain underneath someone's fingernails for months.

¶21 Daniel chose to testify in his defense. He stated that he did not recall what he was doing on the day of Lucy's death. He also denied calling Lucy that evening but said he shared his cell phone with his fiancée. When Daniel's fiancée testified, she claimed she was trying to contact Lucy and had used Daniel's phone to call Lucy and the gas station where Lucy worked. They both claimed the last time they saw Lucy was July 4, 2012.

¶22 Daniel also called Rodney Prestridge to testify. Prestridge testified that, in 2012, he had been squatting in an abandoned trailer in Quartzsite. After Prestridge heard about Lucy's death, someone asked him to let Bottelsen "hide" in the trailer. He allowed her to stay, but he did not remain with her. Bottelsen stayed in the trailer for three days to a week. When Prestridge returned, he noticed that someone had left a purse with some items in it, including a credit card. He testified that he was sure the name on the card was "Laura," until he was asked if he "remember[ed] hearing about [Lucy,]" to which he replied that the name on the card was, in fact, Lucy. He stated that a friend told him that he "may not want to have that," so he "got rid of it."

¶23 After the defense rested, Daniel moved for a judgment of acquittal under Arizona Rule of Criminal Procedure ("Rule") 20, arguing that there was not "sufficient evidence to show that Mr. Daniel is the one who killed [Lucy] or set her trailer on fire" and "that the majority of the evidence actually points to [Bottelsen]." The court denied the motion.

¶24 During jury deliberations, the jury asked the court if it would be harmful if a juror conducted internet research and found that Daniel was previously tried. The court spoke with the foreperson, who explained that the juror only informed the rest of the jury that Daniel had been a part of a previous trial in La Paz County a few years ago; no other information was shared. Other jurors were critical of her mistake. The foreperson added that the jurors did not converse about or seem influenced by the alleged prior trial. Daniel moved for a mistrial, but the court denied the motion. The court replaced the misbehaving juror with an alternate and instructed the panel to begin their deliberations anew.

**¶25**        The jury found Daniel guilty of second-degree murder and arson. Daniel moved for a new trial under Rule 24.1(c)(1) and (3)(A), arguing that the misconduct of the empaneled juror deprived him of a fair trial and the verdict went against the weight of the evidence. The court denied the motion and sentenced Daniel to a presumptive term of 16 years' imprisonment for second-degree murder and a concurrent presumptive term of 10.5 years' imprisonment for arson.

**¶26**        Daniel appealed, and we have jurisdiction under Article 6, Section 9 of the Arizona Constitution, and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

**A.        The Court Did Not Abuse Its Discretion by Modifying Its Pretrial Ruling on the Witness Testimony and Denying Daniel's Mistrial Motion.**

**¶27**        Daniel argues that the superior court denied him a fair trial by failing to enforce its pretrial ruling prohibiting the prosecutor from asking about his fiancée's ex-husband.

**¶28**        Relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. "Unfair prejudice means an undue tendency to suggest decision on an improper basis . . . such as emotion, sympathy or horror." *State v. Riley*, 248 Ariz. 154, 177, ¶ 70 (2020) (quoting *State v. Schurz*, 176 Ariz. 46, 52 (1993)). "We will not reverse the admission of evidence absent a clear abuse of discretion." *State v. Meraz*, 152 Ariz. 588, 589 (1987).

**¶29**        When Daniel moved pretrial to exclude personal information about him and his fiancée, the court ruled that the State was not to ask about Daniel's fiancée's prior marriage. But when the State cross-examined Daniel's fiancée during the trial, the prosecutor asked her if she had been married before dating Daniel. When the defense objected to the State violating the pretrial ruling, the court chose to "allow it a short bit" to see where the line of questioning was headed. The State then asked Daniel's fiancée, "[D]o you remember when the defendant moved in with you and your husband as a renter in your trailer?" Daniel objected again. The parties conferred with the court, and Daniel again moved for a mistrial, arguing that the court had ruled that the testimony was inadmissible as irrelevant. The State countered that the testimony "sets up a timeline of when they met, which [Daniel's fiancée] can never remember." The court ruled that the testimony was "foundational, setting the stage" and allowed the question, adding that it would not "let it go much farther" without "a

connection of some kind." The State asked no other questions about Daniel's fiancée's prior marriage.

¶30        Daniel argues that "[t]his evidence provided unwarranted disparagement to a key defense witness" and its admission "requires that [Daniel's] convictions be vacated." The court found the questions foundational and allowed the State to use them to test the witness's memory only "to a limit." The State did not further question Daniel's fiancée about her prior marriage. The testimony was also not inflammatory or unfairly prejudicial, as Daniel contends. Rather, the two questions merely revealed to the jury that Daniel's fiancée was married before her relationship with Daniel. Because of the testimony's meager prejudicial effect, the court did not abuse its discretion by allowing it.

¶31        To that end, Daniel argues the superior court "committed an error of law" by failing to declare a mistrial because it had "already deemed the personal information to be unduly prejudicial." Although we generally "review the denial of a mistrial motion for an abuse of discretion," *State v. Miller*, 234 Ariz. 31, 40, ¶ 23 (2013), Daniel asserts that because "the trial judge failed to enforce his own pretrial rulings[,] [t]he trial court is not entitled to any deference regarding this issue." Daniel cites no authority to support this contention.

¶32        A court generally "will not reconsider in the same case a point of law it has already decided" under the law-of-the-case doctrine. *Love v. Farmers Ins. Grp.*, 121 Ariz. 71, 73 (App. 1978). But because this doctrine is "a rule of procedure, not substance," the superior court "does not lack the power to change a ruling simply because it ruled on the question at an earlier stage." *State v. King*, 180 Ariz. 268, 279 (1994) (quoting *Love*, 121 Ariz. at 73). And if it chooses to do so, "we review any such reconsideration for abuse of discretion." *Id.* As stated, the superior court did not abuse its discretion by allowing the State to ask two questions eliciting testimony that Daniel's fiancée was married in the past. Thus, it did not err by denying the motion for a mistrial.

**B.    The State Did Not Engage in a Course of Intentional Misconduct that Deprived Daniel of a Fair Trial.**

¶33        Daniel contends he was deprived of a fair trial by the State's "course of intentional misconduct." "We will reverse a conviction because of prosecutorial [error] if misconduct is present and 'a reasonable likelihood exists that [it] could have affected the jury's verdict.'" *See State v. Bocharski*, 218 Ariz. 476, 491, ¶ 74 (2008) (quoting *State v. Anderson*, 210 Ariz. 327, 340,

¶ 45 (2005)). To prevail, Daniel "must demonstrate that the prosecutor's conduct so infected the trial with unfairness as to make [his] conviction a denial of due process." *State v. Roque*, 213 Ariz. 193, 228, ¶ 152 (2006) (quoting *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998), *disapproved on other grounds by State v. Escalante-Orozco*, 241 Ariz. 254 (2017)). We will not reverse unless "the conduct [is] so pronounced and persistent that it permeates the entire atmosphere of the trial. To determine whether prosecutorial [error] permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the misconduct." *Id.* (quoting *Hughes*, 193 Ariz. at 79, ¶ 26).

**¶34**     Daniel asserts the prosecutor erred by (1) launching a "character smear campaign" against his fiancée, (2) misstating the law and facts throughout various proceedings, and (3) trying to intimidate a defense witness. Finally, he argues that the cumulative effect of the misconduct was so pronounced and pervasive that we should vacate his conviction and bar the State from retrying him.

### 1.     The State Did Not Err in its Questioning of Daniel's Fiancée.

**¶35**     Daniel contends the State engaged in a "character smear campaign" during its cross-examination of Daniel's fiancée, pointing to the questions about his fiancée's prior marriage and later about love letters Daniel had written to her.

**¶36**     Daniel lodged relevance objections to a pair of questions during the trial, and both were sustained. The court sustained another relevance objection after a few more questions. The prosecutor then asked Daniel's fiancée if "people ma[d]e comments" when she first started dating Daniel. Daniel objected again and moved for a mistrial, but the court did not hear the question and asked the prosecutor to repeat it. The prosecutor complied, and the court sustained the objection. The prosecutor then asked, "What comments are you talking about here that . . . people say . . . at work?" While asking this question, the prosecutor spoke over the court as it twice sustained another objection.

**¶37**     Daniel argues that "it cannot be said, beyond a reasonable doubt, that the prosecutor's misconduct did not contribute to the verdict." We disagree. As noted above, the questions about the prior marriage were not unduly prejudicial. Similarly, they do not rise to the level of misconduct. As for the remaining questions, the court sustained each objection to them. The court instructed the jurors that "[i]f an objection to a

question [was] sustained, [they] must disregard the question and [they] must not guess what the answer to the question might have been." Because we presume the jurors followed the court's instructions, *State v. Newell*, 212 Ariz. 389, 404, ¶ 69 (2006), we conclude the prosecutor's questions did not contribute to the verdict. *See also State v. Gallardo*, 225 Ariz. 560, 569, ¶ 40 (2010) (conviction affirmed when the trial court's instructions cured any possible prejudice from the prosecutor's statements).

### 2.     The Prosecution's Misstatement of the Facts and Law Does Not Constitute Prosecutorial Error.

**¶38**          Daniel argues that the prosecutor misstated the law and facts throughout the case. He alleges the prosecutor incorrectly argued to the court that it had to provide instructions for lesser-included offenses in the first trial. Still, Daniel concedes this was not a trial error in the retrial. He also claims that the prosecutor, during jury selection but outside the presence of a *voir dire* panel, misstated the law about the requirements of presenting a third-party defense. And, he asserts, the State submitted a sentencing memorandum allegedly containing many misstatements and inaccuracies. But, again, he concedes that he addressed these in his response.

**¶39**          We need not decide whether any of these statements by the prosecutor were substantively incorrect because even if they were, none were made in the presence of the jury that convicted Daniel. Thus, no "reasonable likelihood exists that [these comments] could have affected the jury's verdict." *See Bocharski*, 218 Ariz. at 491, ¶ 74 (quoting *Anderson*, 210 Ariz. at 340, ¶ 45); *see also State v. Armstrong*, 208 Ariz. 345, 357, ¶ 60 (2004) (no misconduct when actions occurred outside the presence of the jury).

**¶40**          Daniel also asserts that the State argued facts not in evidence. During the State's closing argument, the prosecutor recounted the neighbor's statements about the man she saw the night of Lucy's death. The prosecutor stated that the neighbor saw "a young male, thin, white man, blondish-brown hair, baseball cap walking quickly." Daniel did not object, and during the defense closing argument, he reminded the jury that the neighbor could not determine the color of the man's hair.

**¶41**          During the State's rebuttal, the prosecutor corrected her error by instructing the jury to "absolutely ignore [her] comment about hair color." She reminded the jurors that the neighbor's testimony was entered by stipulation and asked them to read it, repeatedly telling them to "go with the stip[ulation]" because her comments were not evidence. Because

defense counsel and the prosecutor both corrected the error to the jury, and the facts were available to the jury in a stipulation, we conclude the mistake was not reversible error because it could not have affected the verdict. Further, the prosecutor's timely and unqualified self-correction contraindicates any inference of intentionality or maliciousness that would demonstrate true prosecutorial misconduct rather than an inadvertent error. *In re Martinez*, 248 Ariz. 458, 470, ¶ 47 (2020) ("When reviewing the conduct of prosecutors in the context of 'prosecutorial misconduct' claims, courts should differentiate between 'error,' which may not necessarily imply a concurrent ethical rules violation, and 'misconduct,' which may suggest an ethical violation.").

### 3. The Alleged Attempt to Intimidate a Defense Witness Does Not Constitute Prosecutorial Misconduct.

¶42 Daniel also alleges that the prosecutor tried to intimidate Prestridge, the defense witness who testified about Bottelsen and the credit card he found in his trailer.

¶43 Before the second trial, the State filed a motion for discovery, asking the court for an order to collect a sample of Prestridge's DNA if he refused to provide one. Daniel opposed the motion, arguing that it was an implicit threat of prosecution designed to intimidate Prestridge. The State responded that it needed the DNA to rebut a potential third-party defense that a reasonable doubt exists because Prestridge's DNA was never tested. The State withdrew its motion at a later hearing because Prestridge's DNA was already "in the system." Prestridge testified at the trial.

¶44 We again conclude that the prosecutor's actions do not constitute error. Although Daniel speculates that the State's motion was meritless and "clearly . . . designed to scare [Prestridge] away from testifying," the State withdrew the motion, and Prestridge ultimately testified. The prosecutor did not commit error, and the withdrawn motion did not prejudice Daniel.

### 4. The Cumulative Effect of the Prosecutor's Alleged Actions Did Not Deprive Daniel of a Fair Trial.

¶45 Finally, Daniel argues that the cumulative effect of the alleged misconduct "clearly deprived [him] of due process." Even if acts of misconduct do not warrant reversal, they may still evidence "persistent and pervasive misconduct." *Bocharski*, 218 Ariz. at 491–92, ¶ 74 (quoting *Roque*, 213 Ariz. at 228, ¶ 155). But without a finding of some act of misconduct,

"there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness." *Id.* at 492, ¶ 75.

**¶46**         Having concluded that each alleged act did not amount to prosecutorial error, there can be no cumulative effect of misconduct here. Moreover, even if misconduct occurred, the alleged issues either arose outside the jury's presence or were remedied before the jury's deliberations. We, therefore, cannot conclude that Daniel's trial was so permeated with unfairness that he was denied due process.

**C.     Daniel Was Not Deprived of a Fair Trial Based on Pretrial Taint or Juror Misconduct.**

**¶47**         Daniel argues he was denied his right to trial by a fair and impartial jury because the superior court (1) denied his motion to dismiss a *voir dire* panel that heard a prospective juror's comment on the case, and (2) denied his motion for a new trial after an empaneled juror conducted external research that she shared with her fellow jurors during deliberations. Every criminal defendant "has a constitutional right to be tried by a fair and impartial jury." *State v. Greenawalt*, 128 Ariz. 150, 167 (1981); *see also* U.S. Const. amend. VI (right to an impartial jury); Ariz. Const. art. 2, § 24 (same).

     **1.     The Superior Court Did Not Abuse Its Discretion by Denying the Motion to Strike the Jury Panel.**

**¶48**         The prospective jurors were told during jury selection that Daniel was charged with causing Lucy's death. One prospective juror immediately asked to be dismissed: "I can't—That lady used to work for us. I didn't know that was the guy that did it." The court dismissed the prospective juror. Daniel then asked the court to dismiss the entire panel. The court denied the motion, instead asking the rest of the panel if anyone could not put aside the prospective juror's comments. Another prospective juror raised his hand and was excused. Daniel later objected to passing the rest of the panel for cause, but the court again denied the motion.

**¶49**         Under Rule 18.4(a), "[a]ny party may challenge the panel on the ground that its selection involved a material departure from the requirements of law." We review the superior court's *voir dire* rulings for an abuse of discretion. *State v. Bush*, 244 Ariz. 575, 584, ¶ 29 (2018).

**¶50**         Daniel asserts that the potential juror had a "strong" and "personal" reaction that he describes as an "emotional outburst" in which the potential juror "literally pointed directly at" Daniel, which he argues

affected the remaining panel members. But the record does not reflect any emotion or gesture by the potential juror. Nor does it contain evidence that the panel was prejudicially tainted. On the contrary, the court excused the potential juror and questioned the rest of the panel. All but one remaining panel member conveyed that they could put aside what they heard, and the potential juror who could not was excused. Essentially, Daniel "merely speculates that this contamination occurred. We will not, however, indulge in such guesswork." *See State v. Doerr*, 193 Ariz. 56, 62, ¶ 18 (1998); *see also State v. Tison*, 129 Ariz. 526, 535 (1981) ("Unless there are objective indications of jurors' prejudice, we will not presume its existence."). The court thus did not abuse its discretion by denying Daniel's motion to strike the panel.

### 2. Daniel Is Not Entitled to a New Trial Based on the Misconduct of a Deliberating Juror.

¶51 During jury deliberations, the court received a question from the jury asking if it would be "harmful to the trial if one jury member looked on [the] internet two days ago about a trial that was referred to by [the] defense and prosecution[.]" The question added that "[t]he outcome of [the] trial was not stated during . . . deliberation[s]." To gain clarity, the court spoke with the foreperson.

¶52 The foreperson explained that a juror was curious "as to why it took so long to get this case to trial" and "apparently . . . looked up on the internet and found out that there had been a previous trial in [La Paz County]." The foreperson told the court that the juror "blurted that out in jury deliberations," and "a couple of other jurors were immediately critical of doing external research contrary to [the court's] instructions." The foreperson added that the jurors only heard "that there was a previous trial of the same defendant in [La Paz County] a couple years ago," but they "stopped it before she commented about the outcome of the trial or anything else that might have influenced everybody else in the room."

¶53 The court asked if the foreperson felt that "anybody was curious and influenced" or if the jurors were more concerned that she was "not supposed to do that." The foreperson replied that it was "exactly the latter" and that "[t]he discussion at that point became only criticism of her for having violated [the] instructions . . . . There was no discussion beyond that of . . . the results of her research on the internet."

¶54 Daniel moved for a mistrial, arguing "[t]he jury now knows that there was another trial; and there might be the assumption that . . . the

trial got reversed on a technicality." The court denied the motion but spoke with the errant juror and replaced her with an alternate**.** Based on the foreperson's explanation of the incident, the court felt confident that the jurors were not influenced by what they heard and declined to question them. The court instructed the jurors that they were to begin their deliberations anew with the alternate juror in place.

¶55 We generally review the superior court's decision on a motion for a new trial based on alleged jury misconduct for an abuse of discretion. *State v. Hall*, 204 Ariz. 442, 447, ¶ 16 (2003). The superior court may order a new trial if a juror "receiv[es] evidence not admitted during the trial." Ariz. R. Crim. P. 24.1(c)(3)(A). A defendant is entitled "to a new trial if the jury receives extrinsic evidence and 'it cannot be concluded beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict.'" *Hall*, 204 Ariz. at 447, ¶ 16 (quoting *State v. Poland*, 132 Ariz. 269, 283 (1982)). Thus, "juror misconduct warrants a new trial if the defense shows actual prejudice or if prejudice may be fairly presumed from the facts." *Id.* (emphasis omitted) (quoting *State v. Miller*, 178 Ariz. 555, 558 (1994)). We will not, however, presume prejudice "without the requisite showing that the jury received *and considered* extrinsic evidence on the issues." *State v. Nelson*, 229 Ariz. 180, 184 (2012) (emphasis added) (quoting *State v. Davolt*, 207 Ariz. 191, 208, ¶ 59 (2004)).

¶56 The jurors received extrinsic evidence, but the record does not reflect that they considered it in reaching their verdict. On the contrary, the foreperson stated that when the juror told the rest of the panel about a previous trial, the other jurors immediately interrupted her before she could say anything "that might have influenced everybody else in the room." He added that the jurors did not seem "curious [or] influenced" but were instead critical of the juror's disobedience.

¶57 Daniel fails to show actual prejudice, conceding that "it is unknown what input or impact [the juror] had." But he argues that the court breached its affirmative duty to investigate the misconduct. The court, however, examined the misconduct by thoroughly questioning the foreperson and speaking with the juror in question before dismissing her. The court also reminded the remaining jurors of their previous admonitions and instructed them to disregard prior deliberations and start anew with the alternate. We presume the jury followed those instructions. *See Newell*, 212 Ariz. at 404, ¶ 69; *see also State v. Hoskins*, 199 Ariz. 127, 141, ¶ 48 (2000) ("Prejudice will not be presumed but must appear affirmatively from the record.").

**¶58** Although the jury received improper extrinsic evidence, we conclude beyond a reasonable doubt that Daniel was not prejudiced. The court did not abuse its discretion by denying the motion.

**D. The Superior Court Did Not Commit Reversible Error by Permitting Expert Testimony and Argument on the DNA Evidence.**

**1. The Superior Court Did Not Err by Admitting the DNA Evidence.**

**¶59** Daniel argues that the superior court failed to properly limit or preclude the State's use of DNA evidence. As mentioned, relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. "We review a trial court's decision whether to admit DNA evidence for an abuse of discretion and in the light most favorable to sustaining its ruling." *Gomez*, 250 Ariz. at 521, ¶ 13. We defer to the superior court because "[t]he conditions of admission of DNA evidence and expert testimony, particularly from the standpoint of Rule 403 prejudice, are necessarily fact-specific and dependent upon the context of the case." *Id.* at 522, ¶ 15.

**¶60** To the extent that Daniel argues that the expert testimony should have been excluded, we disagree. In its pretrial ruling, the court prohibited expert testimony that would conclusively identify Daniel as the contributor to the DNA. The DNA analyst gave no such testimony. Instead, the analyst testified that she tested the autopsy samples for nuclear DNA and Y-STR DNA. She explained that nuclear DNA is unique to each person, and "STR is actually a testing technique for that nuclear DNA." She added that Y-STR DNA is only found in males and is inherited along a male's paternal lineage. By testing for Y-STR, an analyst can distinguish between male and female DNA when there is a mixture of both profiles.

**¶61** The analyst testified that when she tested Lucy's right-hand fingernail clippings and the swabs of those clippings, she observed a DNA mixture consisting of Lucy's DNA and "a partially unidentified male DNA profile." By analyzing the Y-STR, she could identify a "full profile" in the fingernail clippings, which meant each location she could test for was present. She also observed a partial male profile in the swabs of the clippings, which meant that not all the loci were present.

**¶62** The analyst also ran an STR test for nuclear DNA and observed a partial profile in both the clippings and the swabs. She explained that much of what she obtained in nuclear STRs was "below threshold," so she could not compare "for inclusion," but she could still "exclude anything

that does not match." One locus, however, "showed values that were high enough" that it could be used "[n]ot for comparison, but for statistical purposes."

¶63        The analyst testified that she compared the unidentified profile to the eight male DNA profiles she received from the police. Of the eight, only Daniel's profile matched the Y-STR profile found in the fingernail clippings. Thus, she testified that "Daniel and all of his paternally-related male relatives cannot be excluded." The other seven men could be excluded.

¶64        The analyst provided statistical analysis for the Y-STR DNA and STR DNA results separately. She then explained that, because both were present in this case, she could calculate a "likelihood ratio." She concluded that "[i]t is 500 times more likely to see the combined STR and Y-STR DNA profile if . . . [Lucy] and Thomas Daniel are the contributors, [than] if it is [Lucy] and a random unrelated Caucasian." She continued, explaining that it would be 5,500 times more likely to see the profile if it were from Lucy and Daniel than if it were from Lucy and "a random unrelated African-American," 1,100 times more likely than if it were from Lucy and "a random unrelated Hispanic," and 280 times more likely than if it were from Lucy and a "random unrelated Native American." She testified that this statistical analysis is accepted in the scientific community.

¶65        On appeal, Daniel concedes that "[t]he analyst properly testified that [Daniel] could not be excluded as the contributor of the DNA." Nor did the testimony violate the court's pretrial order or create any unfair prejudice under Rule 403 because the analyst did not conclusively identify Daniel as Lucy's assailant or the contributor of the DNA. Instead, she carefully described her processes and analysis. She explained to the jury how much more likely it would be to find the mixed DNA profile if it came from Lucy and Daniel instead of Lucy and certain other "random" individuals. The court did not err by allowing this testimony.

## 2.        The State Did Not Commit Fundamental Error by Arguing that the Foreign DNA Found on the Victim Belonged to Daniel.

¶66        Daniel also argues that the court "failed to control" the State's use of DNA testimony. He contends that "during closing, the prosecutor repeatedly stated, without qualification, that the DNA belonged to . . . Daniel" and argues that "[t]his was not simply a reasonable inference to be drawn from the evidence," but "a highly prejudicial overstatement of the weight of the evidence with little probative value." Because Daniel raised

no objections during the closing argument, we apply fundamental error review. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005). Therefore, we must determine whether the prosecutor committed fundamental error and whether that error prejudiced the defendant. *State v. Murray*, 250 Ariz. 543, 549, ¶ 17 (2021).

**¶67** Prosecutors are generally given "wide latitude" to make their closing arguments and may ask the jury to draw reasonable inferences from the evidence presented. *State v. Goudeau*, 239 Ariz. 421, 466, ¶ 196 (2016) (quoting *State v. Comer*, 165 Ariz. 413, 426 (1990)). The State contends on appeal that "it was not unreasonable for the prosecutor to argue that the DNA belonged to Daniel" because it "was a reasonable inference to draw from the evidence." To be sure, it is hard to square the State's position with the prosecutor's statements to the jury: "You don't have to infer anything[.] His DNA under her nails. . . . That is direct evidence. You don't have to make any inference." The prosecutor also called the DNA "the defendant's" DNA and "his DNA" and concluded that "[t]here is no real possibility that it's anybody else. It's nobody else's DNA."

**¶68** But when viewed in the context of the entire closing argument, the prosecutor did not make the statements "without qualification," as Daniel asserts. Instead, the prosecutor often asked the jury to recall the analyst's testimony. For example, she recounted the analyst's testimony about nuclear DNA, reminding the jury that "all [the analyst] can tell you is all those other men are excluded. . . . and the defendant cannot be excluded. Those are her words. She can't say match [be]cause it's not a full profile." Later, she reminded the jury how the expert analyzed the nuclear DNA and Y-STR DNA together to calculate a likelihood ratio, which is "where she gets her 500 times more likely" conclusion. Furthermore, any potential error would have been cured by the court's instruction that the lawyers' comments during closing arguments are not evidence. *See Newell*, 212 Ariz. at 404, ¶ 69 (We presume the jurors follow the instructions.).

**¶69** When viewed in isolation, a select few of the prosecutor's remarks appear to overstate the DNA analyst's testimony. Still, those statements were not fundamental error when taken in the context of the entire closing argument.

**E.      Substantial Evidence Supports the Jury's Verdict.**

¶70          Finally, Daniel argues that the superior court erred by denying his Rule 20 motion for a judgment of acquittal and his Rule 24.1 motion for a new trial.

**1.      The Superior Court Did Not Err by Denying the Rule 20 Motion.**

¶71          After the defense rested, Daniel moved for a Rule 20 judgment of acquittal, arguing there was insufficient evidence that Daniel killed Lucy and that the evidence instead pointed toward Bottelsen. The court denied the motion. We review the denial of a Rule 20 motion *de novo*. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011). Under Rule 20(a)(1), "the court must enter a judgment of acquittal . . . if there is no substantial evidence to support a conviction." "Substantial evidence . . . is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *West*, 226 Ariz. at 562, ¶ 16 (internal quotation marks omitted) (quoting *State v. Mathers*, 165 Ariz. 64, 67 (1990)).

¶72          Daniel notes the State's heavy reliance on DNA evidence and contends the DNA only established that Daniel could not be excluded from a small group of suspects. This argument understates the significance of the DNA evidence. While the analyst testified that the Y-STR DNA led to her conclusion that Daniel could not be "excluded," her statistical analysis of the likelihood ratios was more informative. She concluded that it was at least 280 times more likely to see the DNA profile found under Lucy's fingernails if it came from Lucy and Daniel rather than from Lucy and another "random" individual. Reasonable jurors could then consider the likelihood ratios combined with other evidence of Daniel's connection to Lucy, such as the phone calls, his nearby home, and the testimony of the neighbor witness, to conclude that the DNA belonged to Daniel.

¶73          Further, Daniel's testimony supports the jury's verdict. Daniel and his fiancée testified that they last saw Lucy on July 4, over a month before her death. But the analyst testified that it would be unlikely that DNA would remain underneath someone's fingernails for months. The analyst also testified that it likely "would take more than just a . . . casual touch" to get DNA under someone's fingernails, and the forensic pathologist identified three "defense injuries" on Lucy's arm, which could suggest that she tried to fight back her assailant. A juror could reasonably conclude from the totality of the evidence that Daniel attacked and killed

Lucy, leaving his DNA under her fingernails as she tried to defend herself. And a juror could reasonably conclude Daniel set Lucy's trailer on fire to cover it up.

¶74 Daniel argues that he "presented a strong third-party and alibi defense." Still, neither defense explains away the DNA evidence so that no reasonable person could find him guilty beyond a reasonable doubt. *West*, 226 Ariz. at 562, ¶ 16. The court did not err by denying the Rule 20 motion.

### 2. The Superior Court Did Not Err by Denying the Rule 24.1 Motion.

¶75 After his conviction, Daniel moved for a new trial under Rule 24.1, arguing that the weight of the evidence warranted a new trial. The court summarily denied the motion. We will affirm the superior court's ruling on a motion for a new trial based on the weight of the evidence, absent an abuse of discretion. *State v. Neal*, 143 Ariz. 93, 97 (1984). "A motion for new trial should be granted 'only if the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant committed the crime.'" *State v. Parker*, 231 Ariz. 391, 408, ¶ 74 (2013) (quoting *State v. Landrigan*, 176 Ariz. 1, 4 (1993)). As explained, the State presented sufficient evidence to support the jury's conclusions. The court, therefore, did not err by denying the motion.

### CONCLUSION

¶76 We affirm.

