IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

CARLOS TERCERO CRUZ,
*Petitioner,*

*v.*

THE HONORABLE MICHAEL BLAIR,
JUDGE OF THE SUPERIOR COURT OF
THE STATE OF ARIZONA, IN AND FOR
THE COUNTY OF MARICOPA,
*Respondent Judge,*

STATE OF ARIZONA, EX REL. RACHEL MITCHELL,
MARICOPA COUNTY ATTORNEY,
*Real Party in Interest.*

No. CR-22-0123-PR
Filed July 11, 2023

Appeal from the Superior Court in Maricopa County
The Honorable Michael C. Blair
No. CR2015-123744-002
**AFFIRMED**

Order of the Court of Appeals, Division One
No. 1 CA-SA 22-0071

COUNSEL:

Brent E. Graham (argued), Law Office of Brent E. Graham PLLC, Dolores, Colorado; Robyn Greenberg Varcoe, Varcoe Law Firm, PLLC, Phoenix; Jennifer L. Willmott, Willmott and Associates, PLC, Phoenix, Attorneys for Carlos Tercero Cruz

Rachel H. Mitchell, Maricopa County Attorney, Julie A. Done, Deputy County Attorney, Krista Wood, Deputy County Attorney, Ellen M. Dahl, Catherine Ferguson-Gilbert, Nicholas Klingerman (argued), Maricopa County Attorney's Office, Phoenix, Attorneys for State of Arizona

David J. Euchner (argued), Pima County Public Defender's Office, Tucson; Lisa R. Bivens, Mitchel Stein Carey Chapman PC, Phoenix, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

Mark Brnovich, Arizona Attorney General, Linley Wilson, Deputy Solicitor General, Section Chief of Criminal Appeals, Michael T. O'Toole, Assistant Attorney General, Criminal Appeals Section, Phoenix, Attorneys for Amicus Curiae for Arizona Attorney General

---

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, and PELANDER (Retired) joined.[*]

JUSTICE KING, Opinion of the Court:

¶1        In this case we are asked to address whether the trial court properly precluded Carlos Tercero Cruz from presenting at trial expert and lay witness testimony about his intellectual disability.   To defend charges that he abused, kidnapped, and murdered his young daughter, Cruz seeks to proffer that testimony "not to negate mens rea, but to rebut the actus reus of the offense by showing he is so disabled he could not physically perform the acts necessary to be guilty of failing to take steps to protect his daughter."   We conclude the trial court properly precluded Cruz's proffered expert and lay witness testimony about his intellectual disability.

---

[*] Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.) of the Arizona Supreme Court was designated to sit in this matter.

Cruz may, however, introduce admissible "behavioral-tendency evidence," *see State v. Malone*, 247 Ariz. 29, 31–32 ¶¶ 10–11 (2019), also referred to as "observation evidence," *see Clark v. Arizona*, 548 U.S. 735, 757–60 (2006), through expert and lay witness testimony.

**¶2**          We must also determine whether the trial court abused its discretion in reducing Cruz's proposed list of lay witnesses from eleven to two.    We conclude the trial court did not.

## I.      BACKGROUND

### A.  Criminal Charges and Pre-Trial Proceedings

**¶3**          Cruz had at least three children who resided with him and his wife, Rosemary Velazco, at various times.   Cruz's daughter, A.T., was born in 2011.   A.T. was placed in foster care for about a year while Cruz and Velazco attended parenting classes through the Department of Child Safety.

**¶4**          In 2015, emergency services were called to Cruz's home. A.T. was transported to the hospital where she was pronounced deceased. A.T. passed away just a few days before her fourth birthday.   The State alleges the following circumstances surrounding A.T.'s death: (1) A.T. had lacerations and contusions on her forehead, an infected cauliflower ear, wounds on her chest, back, arms, and legs, a swollen knee, and possible ligature marks on her ankles and wrists; (2) at the time of her death, she weighed just sixteen pounds, which was well below the expected weight for children her age; and (3) "the combination of numerous blunt force injuries in the setting of a weakened immune system due to malnutrition and dehydration, as well as methamphetamine toxicity, likely caused a fatal cardiac dysrhythmia (irregular heartbeat) and/or fatal respiratory failure."[1]

**¶5**          Cruz was charged with child abuse (five counts), kidnapping, and first degree felony murder for A.T.'s death in the course of committing child abuse under A.R.S. § 13-3623.   The State filed a notice of intent to seek the death penalty.   Cruz moved to dismiss the death penalty notice

---

[1]  In 2017, Velazco pleaded guilty and was sentenced to natural life followed by consecutive sentences totaling fifty-nine years.

pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), claiming he was intellectually disabled. The State later withdrew its notice of intent to seek the death penalty.

¶6 The trial court conducted competency proceedings. Cruz was originally found incompetent to stand trial. But after restoration treatment, the court determined Cruz was competent to stand trial.

## B. Proffered Expert Testimony

¶7 Cruz disclosed Dr. Francisco Gómez as his expert witness for trial. Dr. Gómez is a psychologist who evaluated Cruz on several occasions. In a report, Dr. Gómez concluded Cruz's intelligence quotient is sixty-four, which is "more than two standard deviations below the average (i.e., below the 2nd percentile)." He also determined Cruz "meets the criteria for the diagnosis of Intellectual Disability according to all professional and clinical standards."

¶8 The State moved to preclude mental health expert testimony by Dr. Gómez. The State argued such testimony is not relevant, should be excluded under Arizona Rule of Evidence 403, and is improper diminished capacity evidence under *Clark*, 548 U.S. 735; *Malone*, 247 Ariz. 29; and *State v. Mott*, 187 Ariz. 536 (1997). The trial court granted the State's motion. The court explained Dr. Gómez's testimony "could be excluded under Rule 403" as it "could confuse the issues or mislead the jury on issues that are not supposed to be in front of the jury." Further, the court determined Dr. Gómez's testimony was improper "diminished capacity defense clothed in other garments," which is "precluded by Arizona law."

## C. Proffered Lay Witness Testimony

¶9 Before trial, Cruz notified the State that he would call eleven lay witnesses who resided in Mexico. The State moved to preclude these witnesses, arguing they have no direct knowledge of the facts and circumstances of the charged crimes and that any probative value of their testimony is substantially outweighed by unfair prejudice, sympathy, confusion of the issues, and misleading the jury. The State also opposed the lay witnesses on the basis that Arizona law precludes diminished capacity evidence.

4

¶10 In response, Cruz argued the witnesses were necessary to testify about his inability to read, write, speak English, text, email, cook, handle money, find an address, and operate a global positioning system ("GPS"). He seeks to use this evidence to explain why he could not call for help, take his daughter to a hospital, read instructions on medicine bottles, or perform other parenting actions. Specifically, Cruz claims that his cousin, Eloy Gutierrez, knew him when they came to the United States together and can testify about Cruz's limitations—for example, that Cruz would get lost going to his work two blocks away and that Cruz could not read, write, or cook. Cruz, however, has not had contact with the witnesses for years (none within the nine-year period preceding the alleged criminal conduct) and has not seen Gutierrez since about 2006.

¶11 The trial court determined that "evidence of [Cruz's] inability to read, write, speak English, text, email, handle money, operate a GPS, or find an address is relevant," but Cruz's "desire to call eleven lay witnesses to say essentially the same thing would be a needless presentation of cumulative evidence" in violation of Rule 403. The court ruled, therefore, that Cruz may not call all eleven lay witnesses but may call two of them to testify about their personal knowledge of his "inability to read, write, speak English, text, email, handle money, operate a GPS, or find an address." The court directed that one witness "must be Eloy Gutierrez since the defense emphasized his importance" and Cruz may choose the second witness.

¶12 Cruz filed a petition for special action in the court of appeals, which declined jurisdiction. We granted review because this case presents recurring issues of statewide concern. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II. DISCUSSION

¶13 "We review a trial court's decision regarding the admissibility of evidence for abuse of discretion," *State v. Richter*, 245 Ariz. 1, 4 ¶ 11 (2018), and "in the light most favorable to sustaining its ruling," *State v. Gomez*, 250 Ariz. 518, 521 ¶ 13 (2021). "An error of law committed in reaching a discretionary conclusion may, however, constitute an abuse of discretion." *State v. Wall*, 212 Ariz. 1, 3 ¶ 12 (2006). "We review the

interpretation of court rules de novo . . . ."  *State v. Bernstein*, 237 Ariz. 226, 228 ¶ 9 (2015).

## A.   Expert Testimony About Cruz's Intellectual Disability

**¶14**　　Cruz seeks to introduce expert testimony from Dr. Gómez to establish that he is intellectually disabled and then connect that disability to his inability to perform certain tasks, such as reading, dialing telephone numbers, following travel directions, purchasing food, and cooking.　Cruz claims he wants "to introduce evidence of his disability not to negate mens rea, but to rebut the actus reus of the offense by showing he is so disabled he could not physically perform the acts necessary to be guilty of failing to take steps to protect his daughter."　Cruz asserts his proffered evidence is not about his intent with respect to his daughter (e.g., "I should give her medicine") but is instead about the execution of the task (e.g., "I cannot read this bottle").

### 1.   Mental disease or defect and mens rea

**¶15**　　In Arizona, legal insanity is a permissible affirmative defense to a crime:

> A person may be found guilty except insane if at the time of the commission of the criminal act the person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong. A mental disease or defect constituting legal insanity is an affirmative defense.

A.R.S. § 13-502(A).　Although Cruz filed a notice stating he will raise two defenses at trial (mere presence and insufficiency of evidence), he did not assert legal insanity as a defense.

**¶16**　　In *Mott*, this Court held "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the *mens rea* element of a crime."　187 Ariz. at 541. Mott, who was charged with child abuse, offered expert psychological testimony that she "was a battered woman and that being a battered woman was relevant to her ability to protect her children."　*Id.* at 539.

6

She claimed the evidence would "demonstrate that [she] was not capable of forming the requisite mental state of knowledge or intent"—evidence that would "negate the *mens rea* element of the crime." *Id.* at 540. In determining whether such evidence was admissible, this Court noted "the legislature is responsible for promulgating the criminal law," but it had "declined to adopt the defense of diminished capacity when presented with the opportunity to do so." *Id.* at 540–41 (noting that use of mental disease or defect evidence to refute mens rea is referred to as "diminished capacity" or "diminished responsibility" defense). More specifically:

> The 1962 version of the Model Penal Code allowed the admission of "[e]vidence that the defendant suffered from a mental disease or defect . . . whenever it [wa]s relevant to prove that the defendant did or did not have a state of mind that is an element of the offense." Model Penal Code § 4.02(1) (1962). This section was written in recognition of the existence of "degrees of mental disease or defect that fall short of that required for invoking the defense of irresponsibility, but that may be put in evidence as tending to show that the defendant lacked the specific *mens rea* required for the commission of the offense charged." Model Penal Code and Commentaries § 4.02(1) cmt. 2 (1985). The legislature's decision not to adopt this section of the Model Penal Code evidences its rejection of the use of psychological testimony to challenge the *mens rea* element of a crime.

*Id.* at 540 (alterations in original). Then, citing A.R.S. § 13-502(A) (1984),[2] this Court held that Mott's proffered expert testimony regarding the battered-woman syndrome was inadmissible "to demonstrate that [Mott's] mental incapacity negated specific intent." *Id.* at 544.

---

[2] The version of § 13-502(A) (1984) applicable to Mott's 1991 offense stated: "A person is not responsible for criminal conduct by reason of insanity if at the time of such conduct the person was suffering from such a mental disease or defect as not to know the nature and quality of the act or, if such person did know, that such person did not know that what he was doing was wrong." *See Mott*, 187 Ariz. at 541.

**¶17** We have continually reaffirmed that "[t]he legislature has not provided for, and this Court has refused to allow, an affirmative defense of diminished capacity." *State v. Leteve*, 237 Ariz. 516, 524 ¶ 20 (2015); *see also State v. Schantz*, 98 Ariz. 200, 207, 212–13 (1965) (considering and rejecting defense of diminished capacity and noting the legislature "has not recognized a disease or defect of mind in which volition does not exist . . . as a defense to a prosecution for" a crime). Most recently, in *Malone*, this Court affirmed the preclusion of expert testimony that the defendant "suffered from brain damage even if that impairment made it more likely that he had a character trait for impulsivity." 247 Ariz. at 34 ¶ 21. In doing so, we reiterated *Mott*'s rule that "Arizona does not permit a defendant to introduce evidence of a mental disease or defect as either an affirmative defense or to negate the mens rea element of a crime," *id.* at 31 ¶ 8, and that the "legislature quite clearly, albeit implicitly, rejected the mens rea approach by adopting the alternative approach currently set forth in § 13-502(A)," *id*. at 35 ¶ 25.

## 2. Mental disease or defect and actus reus

**¶18** Cruz admits "the rule of diminished capacity in Arizona is plain—evidence of a diminished mental capacity may not be used to negate mens rea." Cruz claims, however, that Dr. Gómez's testimony is admissible to rebut actus reus.

**¶19** Actus reus is codified in A.R.S. § 13-201: "The minimum requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform a duty imposed by law which the person is physically capable of performing."[3] *See State v. Lara*, 183 Ariz. 233, 234 (1995) ("A.R.S. § 13-201 is a codification of the common law requirement of *actus reus*—that a crime requires an act. A guilty mind (*mens rea*) is not enough."). Thus, actus reus is the performance of conduct which can be either: (1) performance of a voluntary act, *or* (2) failure to perform a duty imposed by law which the person is physically capable of performing. § 13-201.

---

[3] Likewise, A.R.S. § 13-105(6) defines "[c]onduct" as "an act or omission and its accompanying culpable mental state."

**¶20** Cruz argues that testimony about his intellectual disability "rebuts the voluntary act element." A "voluntary act" is "a bodily movement performed consciously and as a result of effort and determination." § 13-105(42); *see also Lara*, 183 Ariz. at 234–35 (explaining a voluntary act is "a determined conscious bodily movement"). This is "in contrast to a knee-jerk reflex driven by the autonomic nervous system" or "a bodily movement while unconscious, asleep, under hypnosis, or during an epileptic fit," *Lara*, 183 Ariz. at 234–35, or "*actually* being controlled by something or someone else," *State v. Moody*, 208 Ariz. 424, 468 ¶ 200 (2004).

**¶21** We have previously decided that mental disease or defect evidence does not inform what constitutes a "voluntary act" under § 13-201 and § 13-105(42). *See Lara*, 183 Ariz. at 234–35 (holding defendant with "brain impairment and personality disorder" was not entitled to voluntary act instruction under § 13-201 because he committed aggravated assault when "[h]e was not unconscious" and instead "was relentless in his effort and determination"); *Moody*, 208 Ariz. at 468 ¶¶ 200–01 (holding defendant was not entitled to voluntary act instruction where no expert testimony "suggested that [his] actions were not performed consciously and as a result of effort and determination;" his brain impairments "do not inform the actus reus determination"). Cruz does not allege he experienced an epileptic fit or was unconscious, asleep, or otherwise "controlled by something or someone else," *Moody*, 208 Ariz. at 468 ¶ 200, such that his acts were involuntary with respect to his daughter's care. Thus, testimony about Cruz's intellectual disability is irrelevant to the performance of a "voluntary act" under § 13-201.

**¶22** Cruz also suggests that evidence of his intellectual disability informs "the omission to perform a duty imposed by law which the person is physically capable of performing." *See* § 13-201. We have not previously addressed this issue.

**¶23** An "omission" is "the failure to perform an act as to which a duty of performance is imposed by law." § 13-105(28). An "act" is "a bodily movement." § 13-105(2). Accordingly, the relevant question is whether Cruz failed to perform a bodily movement that he was physically capable of performing and had a legal duty to perform—here, parenting and caring for A.T. in a manner that did not constitute child abuse under § 13-3623.

¶24        Dr. Gómez's testimony about Cruz's intellectual disability and its impact on his ability to read, dial telephone numbers, follow travel directions, purchase food, and cook does not suggest Cruz was *physically* incapable of performing bodily movements to care for A.T. or to seek help. Instead, such evidence may suggest that his intellectual disability caused him not to *know* how to do certain things for A.T.   It may also suggest Cruz did not *know* whether he should take certain actions, which pertains to mens rea and, as explained, the evidence is inadmissible for that purpose.   An "omission" is statutorily focused on whether the defendant "is physically capable of performing" a "bodily movement"—not his intellectual capacity. *See* §§ 13-201, -105(2), (28).   Thus, testimony about Cruz's intellectual disability is irrelevant to showing an "omission" under § 13-201.

¶25        In addition, Rule 403 authorizes a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues."   Allowing the admission of testimony about Cruz's intellectual disability—evidence that goes beyond a showing of physical capability—inevitably veers into mens rea territory, which would create confusion on the part of jurors.   *See Clark*, 548 U.S. at 779 (explaining the *Mott* rule serves "to avoid confusion and misunderstanding on the part of jurors").

¶26        Cruz cites cases in which this Court permitted diminished capacity evidence for purposes other than negating mens rea.   *See State v. Miles*, 243 Ariz. 511, 514 ¶ 14 (2018) ("Because evidence of diminished capacity and voluntary intoxication is relevant to deciding whether a defendant subjectively appreciated that his acts were likely to result in another's death, this evidence is admissible in the *Tison* inquiry if otherwise admissible under our evidentiary rules."); *Richter*, 245 Ariz. at 5 ¶ 15 ("Because [defendant] sought to assert a justification defense, the evidence of duress she would have introduced in support of that defense did not constitute 'diminished capacity' evidence and was not prohibited by *Mott*.").   But this authority provides Cruz no relief here because the proffered testimony about his intellectual disability is inadmissible to rebut actus reus, the only other purpose he offers for admission of this evidence.

¶27        The trial court did not abuse its discretion by precluding Dr. Gómez's testimony about Cruz's intellectual disability as irrelevant or

alternatively as inadmissible because any probative value is substantially outweighed by a danger of confusing the issues. *See* Rule 401 (defining relevant evidence); Rule 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues.").

## B. Lay Testimony About Cruz's Intellectual Disability

**¶28** Cruz likewise argues he should be allowed to present lay witness testimony about his intellectual disability to rebut the actus reus of the charged offenses. He claims "[t]he lay witnesses can describe Cruz'[s] ongoing disabilities from the time he was a child" and that "despite repeated attempts to teach him, Cruz was unable to learn to write his own name or learn numbers." He claims this "information is highly relevant to a jury regarding the severity [of his disability] and is therefore, reliable evidence of [his] disability." For the same reasons set forth in Part II(A), the trial court did not err in precluding Cruz's lay witness testimony about his intellectual disability.

## C. Permissible Evidence

**¶29** Although evidence of Cruz's intellectual disability is inadmissible, *Mott* imposes no restriction on a jury's consideration of "'observation evidence' in the everyday sense, testimony from those who observed what [defendant] did and heard what he said." *Clark*, 548 U.S. at 757.[4] "[O]bservation evidence can be presented by either lay or expert witnesses." *Id.* at 757-58; *see also id.* at 760 (discussing "observation evidence" in the form of expert testimony about "a defendant's tendency to think in a certain way or his behavioral characteristics," which *Mott* indicated "was perfectly admissible to rebut the prosecution's evidence of *mens rea*"); *see also Mott*, 187 Ariz. at 544 (explaining the admissible evidence in *State v. Christensen*, 129 Ariz. 32, 34 (1981), was "evidence about his behavioral tendencies").

---

[4] The observation evidence in *Clark* included the defendant's "behavior at home and with friends, his expressions of belief around the time of the killing that 'aliens' were inhabiting the bodies of local people (including government agents), [and] his driving around the neighborhood before the police arrived." 548 U.S. at 757.

¶30          This Court recently elaborated on this type of evidence in *Malone*:

> The United States Supreme Court in *Clark*, 548 U.S. at 757, coined the term "observation evidence" to describe the type of character trait evidence permitted in *Christensen*. *See also Richter*, 245 Ariz. at 8 ¶ 33; *Leteve*, 237 Ariz. at 524 ¶ 21. "Observation evidence" is a slight misnomer, however, as the psychiatrist's opinion in *Christensen*, like Dr. Sullivan's proffered brain-damage testimony here, depended on results from diagnostic tests administered to the defendant as well as the psychiatrist's personal observations of him. *See Christensen*, 129 Ariz. at 34. A more accurate term for the evidence deemed admissible in *Christensen* is "behavioral-tendency evidence," which is admissible to show a character trait. *See Mott*, 187 Ariz. at 544 (describing *Christensen* as involving "evidence about [the defendant's] behavioral tendencies"); *see also* Ariz. R. Evid. 404(a)(1) (permitting evidence of an accused's pertinent character trait).

247 Ariz. at 32 ¶ 11 (alteration in original) (cleaned up); *see also id.* at 31 ¶ 10 ("[E]vidence of a defendant's behavioral tendencies is not diminished capacity evidence and may be admitted to challenge the mens rea of premeditation for a first degree murder charge.").

¶31          The State acknowledges it does not object to lay witnesses providing observation evidence testimony.  For example, in response to any argument that Cruz could have driven his daughter to the hospital, the State does not object to a lay witness offering observation evidence that Cruz cannot drive.  Further, if Cruz calls a witness who knows him personally and testifies "it's my belief he cannot read," the State agreed Cruz should be allowed to do that.  The State also does not object to Dr. Gómez testifying about his observations of Cruz's behaviors and traits, so long as he does not testify about the mental capabilities and capacity underlying those observations or offer diminished capacity evidence.

¶32          Accordingly, Cruz may introduce "behavioral-tendency evidence," *see Malone*, 247 Ariz. at 31–32 ¶¶ 10–11, also referred to as

"observation evidence," *see Clark*, 548 U.S. at 757–60, through expert and lay witness testimony, so long as such evidence is otherwise admissible under the Rules of Evidence. *See State v. Dickey*, 125 Ariz. 163, 169 (1980) (affirming exclusion of certain testimony of psychiatrist, while noting separate expert "opinion of several traits of appellant's personality, such as being overly protective, easily fearful, and not prone to violence . . . may provide assistance to a lay jury"). But witnesses may not state that Cruz's intellectual disability is the underlying cause of his character traits or behavioral tendencies. As in *Malone*, this Court will not "circumvent Arizona's longstanding jurisprudence . . . by permitting defendants to introduce evidence of a behavioral tendency and then 'corroborating' its existence by providing mental disease or defect evidence to explain the cause for that behavior." 247 Ariz. at 34 ¶ 20; *see also id.* ("Although behavioral-tendency evidence is permissible to negate mens rea, linking that behavior to a mental disease or defect, whether directly or under the guise of corroboration, is impermissible.").[5]

**¶33** Cruz and the State have stipulated that Cruz is illiterate. We agree with the trial court that the jury can be informed of his illiteracy, but Cruz may not use the word "involuntary" in conjunction with his illiteracy at trial, nor may the State imply or insinuate that Cruz could have learned to read.

---

[5] Amicus curiae Arizona Attorneys for Criminal Justice raises several issues that were not briefed or argued by the parties. For example, amicus argues legislative amendments after the offense date in *Mott* now "allow use of evidence of diminished capacity or mental disorders to negate *mens rea*." Amicus further claims *Malone*'s conclusion was based "upon a faulty premise," its "rationale must be clarified in the context of crimes of omission," and cases like it "fail to distinguish permissible and impermissible defenses as defined by the Legislature." We decline to reexamine these cases or address amicus' arguments as "[w]e generally do not reach out to . . . upset established precedent when no party has raised or argued such issues." *See State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 599 ¶ 45 (2017); *see also City of Phx. v. Phx. Civic Auditorium & Convention Ctr. Ass'n*, 99 Ariz. 270, 274 (1965) ("Amicus curiae will not be permitted to create, extend, or enlarge the issues.").

### D. Reducing Cruz's Lay Witnesses from Eleven to Two

¶34        Cruz identified eleven lay witnesses to testify about his "early life growing up in rural Mexico" and his inability to read, write, speak English, text, email, cook, handle money, find an address, or operate a GPS. He has not been in contact with these lay witnesses for years, and none within the nine-year period preceding the alleged criminal conduct.

¶35        Cruz claims Gutierrez will testify that (1) Cruz could not cook, read, or write and would often get lost; (2) Gutierrez had to guide Cruz when they came to the United States together from Mexico; and (3) Gutierrez helped Cruz get a job, but Cruz could not find his way to work, which was two blocks away. Cruz has not seen Gutierrez since about 2006.

¶36        As to the others, Cruz claims: (1) Beatriz Adriana Diaz Cruz has personal knowledge that Cruz cannot read, write, or handle money, although she has not seen Cruz in about sixteen years; (2) Guillermo Cruz, a teacher for over thirty years, attempted to teach Cruz to write his name once a week for a year when Cruz was a child, but he did not learn how to write his name; and (3) other lay witnesses will say how they tried to teach Cruz how to read or write, but those efforts were unsuccessful.

¶37        The trial court determined that calling "eleven lay witnesses to say essentially the same thing would be a needless presentation of cumulative evidence" under Rule 403, but Cruz may call two lay witnesses—Gutierrez and one other of Cruz's choosing. Under Rule 403, the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence." The trial court did not abuse its discretion. First, the probative value of the lay witness testimony is diminished in light of the significant passage of time since these individuals personally observed Cruz, and thus their testimony is based on dated information. *See, e.g.*, *State v. Fleming*, 117 Ariz. 122, 125–26 (1977) ("As evidence of the witness' condition becomes more remote in time, it has proportionately less bearing on the credibility of the witness."). Second, the lay witness testimony is cumulative. Gutierrez may testify that Cruz could not cook, read, write, follow directions, or find his way to work that was two blocks away, and Cruz would get lost. And Cruz may select one

additional lay witness to testify about his or her personal observations of Cruz.

### E.   Due Process

¶38        Cruz argues the restrictions placed on his proffered expert and lay witness testimony violate due process by denying him the opportunity to present a complete, meaningful defense under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and article 2, section 24 of the Arizona Constitution.[6]   "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"   *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Trombetta*, 467 U.S. at 485 ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.   We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense.").

¶39        Cruz provides no authority that recognizes a due process right to present evidence of intellectual disability to rebut actus reus.   Nor do his cited cases establish a due process right to present multiple lay witnesses who lack personal knowledge of the alleged criminal conduct and last had contact with the defendant years before the alleged crimes. *See Washington v. Texas*, 388 U.S. 14, 16, 23 (1967) (holding defendant was denied right to compulsory process where he was prevented from presenting a witness who was "the only person other than [defendant] who knew exactly who had fired the shotgun and whether [defendant] had at

---

[6] *See* U.S. Const. amend. V ("[n]o person shall . . . be deprived of life, liberty, or property, without due process of law"); *id.* amend. XIV ("nor shall any State deprive any person of life, liberty, or property, without due process of law"); *see also id.* amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor"); Ariz. Const. art. 2, § 24 ("[i]n criminal prosecutions, the accused shall have the right . . . to have compulsory process to compel the attendance of witnesses in his own behalf").

the last minute attempted to prevent the shooting"); *Chambers v. Mississippi*, 410 U.S. 284, 289, 292–94, 300–03 (1973) (holding defendant was denied a fair trial where he was prevented from cross-examining a witness who made four confessions to the murder and also prevented from introducing testimony of three people to whom that witness had confessed); *Trombetta*, 467 U.S. at 485, 491 (1984) (addressing a "group of constitutional privileges [that] delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system" and concluding due process "does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial"); *Crane*, 476 U.S. at 684, 687, 691 (concluding exclusion of testimony about the physical and psychological environment that yielded defendant's confession deprived him of "his fundamental constitutional right to a fair opportunity to present a defense" where defendant argued "there was no physical evidence to link him to the crime" and "his earlier admission of guilt was not to be believed"); *State v. Prasertphong*, 210 Ariz. 496, 501 ¶¶ 22–23 (2005) (concluding that trial court's decision to admit remaining portions of co-defendant's statement under rule of completeness did not violate the Confrontation Clause).

¶40        The Supreme Court has explained:

> [T]he right to introduce relevant evidence can be curtailed if there is a good reason for doing that. "While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."

*Clark*, 548 U.S. at 770 (alteration in original) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)).  In addition, the Supreme Court has recognized that the characteristics of mental-disease and defect evidence give rise to risks in the evidentiary context, including: (1) "the controversial character of some categories of mental disease"; (2) "the potential of mental-disease evidence to mislead" and "confuse" jurors

"through the power of this kind of evidence to suggest that a defendant suffering from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all"; and (3) "the danger of according greater certainty to capacity evidence than experts claim for it." *Id.* at 773–78 (addressing the *Mott* rule). To that end, the *Mott* "rule serves to preserve the State's chosen standard for recognizing insanity as a defense and to avoid confusion and misunderstanding on the part of jurors." *Id.* at 779. Therefore, "there is no violation of due process . . . and no cause to claim that channeling evidence on mental disease and capacity offends any 'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)).

¶41        Here, as in *Clark*, the trial court had "good reasons" to preclude expert and lay witness testimony about Cruz's intellectual disability as irrelevant or alternatively as inadmissible because of a danger of confusion under Rule 403, *see supra* ¶¶ 19–28. "While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," *see Clark*, 548 U.S. at 770 (alteration in original), the trial court's evidentiary rulings here do not fall into this category. The trial court applied "well-established rules of evidence" that allow it to exclude irrelevant evidence and relevant "evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* (quoting *Holmes*, 547 U.S. at 326).

¶42        Although Cruz may not present evidence of his intellectual disability at trial, he may present evidence that he is illiterate. He may also present admissible behavioral-tendency evidence, also referred to as observation evidence, through expert testimony and two lay witnesses. In doing so, Cruz could argue the evidence of his behavioral tendencies "rebut[ted] the prosecution's evidence of mens rea," *see Clark*, 548 U.S. at 760; *Mott*, 187 Ariz. at 544, or he was not "physically capable of performing" the acts necessary for the safety and care of A.T., *see* § 13-201. Cruz will have a meaningful opportunity to present a complete defense. *See Crane*, 476 U.S. at 690.

¶43        In addition, the trial court did not violate Cruz's right to due process in reducing his eleven lay witnesses to two.    These individuals last had contact with Cruz years before the alleged criminal conduct and would present cumulative evidence.    Although "an accused . . . has the right to present his own witnesses to establish a defense," *Washington*, 388 U.S. at 19, "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689–90 (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

¶44        The trial court's decision was made through the application of well-established evidentiary rules that serve the interests of fairness and reliability in light of the diminished probative value and cumulative nature of Cruz's proffered lay witness testimony, *see supra* ¶¶ 34-37.    *See id.* at 690 ("[W]e have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability — even if the defendant would prefer to see that evidence admitted."); *see also Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence.    The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly."); *see also Prasertphong*, 210 Ariz. at 502 ¶ 26 (noting both the accused and the State "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence" (quoting *Chambers*, 410 U.S. at 302)).

¶45        The limitation on lay witnesses imposed here is vastly different from the situation in *Crane*, which involved "the blanket exclusion of the proffered testimony about the circumstances of [defendant's] confession" that "deprived him of a fair trial."    476 U.S. at 690.    It is also unlike the situation in *Washington*, where the defendant was prevented from presenting the single witness (other than himself) "who knew exactly who had fired the shotgun" and whether the defendant "attempted to prevent the shooting."    388 U.S. at 16.    The trial court's rulings did not deny Cruz a meaningful opportunity to present a complete defense or violate due process.

### III. CONCLUSION

¶**46**     We affirm the trial court's pre-trial orders regarding Cruz's proffered expert and lay witness testimony about his intellectual disability.