NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DENISE SNOW-INGRAM, *Appellant.*

No. 1 CA-CR 24-0055

FILED 03-25-2025

Appeal from the Superior Court in Maricopa County
No.  CR2015-001100-002
The Honorable Suzanne Marie Nicholls, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Maricopa County Legal Defender's Office, Phoenix
By Kush Govani
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Vice Chief Judge Randall M. Howe joined.

---

**J A C O B S**, Judge:

¶1         Denise Snow-Ingram appeals her convictions and sentences for second-degree murder and child abuse, alleging error and constitutional violations. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2         In July 2013, Snow-Ingram's fifteen-month-old daughter died of rickets while in her care and the care of her husband, Ernest Ingram.

### A.    Snow-Ingram Gives Birth to M.I. After Being Rushed to the Hospital, and M.I. Is Assessed for Her Low Weight.

¶3         In March 2012, when Snow-Ingram was pregnant with M.I., she began experiencing complications, including seizures, as the result of eclampsia. She and her husband had religious objections to seeking medical care but sought medical intervention because they deemed her condition an emergency. On March 13, 2012, M.I. was born via Caesarean section at almost thirty-eight weeks, weighing approximately four and a half pounds.

¶4         For ten days after the birth, Snow-Ingram and M.I. stayed at the hospital. M.I. was assessed for her low birth weight and lost some weight during her stay. The hospital scheduled follow-up visits for M.I. for three days after release and two weeks after release, for her failure to thrive. Snow-Ingram only brought M.I. in for the first visit.

### B.    After M.I. Dies, Police Arrest Snow-Ingram and Search Her Home.

¶5         On July 10, 2013, Snow-Ingram called 9-1-1 after finding M.I., fifteen months old, not breathing in her playpen. Once first responders arrived, Snow-Ingram told police that she discovered M.I. unresponsive after checking on her. She said she had laid M.I. down after feeding her

two hours earlier. Though she was fifteen months old, paramedics testified M.I.'s appearance was like that of a four-to-six-month-old child. M.I. was not breathing and had no pulse when the paramedics arrived. She was pronounced dead on arrival at the hospital. M.I. had very little subcutaneous fat on her body and weighed under nine pounds.

¶6 Phoenix police contacted Snow-Ingram and asked to interview her and her husband at police headquarters. Both parents agreed. At the start of the interview, before warning Snow-Ingram pursuant to *Miranda v. Arizona*, 382 U.S. 436 (1966), Lieutenant Christine Calderon asked about Snow-Ingram's schooling and level of education. Snow-Ingram responded that she went to college and finished four years of a five-year mechanical engineering program but did not graduate. She was then read *Miranda* warnings and the interview continued. Calderon determined she had probable cause to arrest Snow-Ingram for child abuse. The police arrested her.

¶7 The same day, police executed a search warrant on her apartment. While searching the apartment, officers observed "at least 3 central processing units with monitors and a laptop computer." They also saw a digital camera. Because the original search warrant did not include these items, and officers had learned that Snow-Ingram had home-schooled her other children on the computers and had attempted to self-diagnose using a computer in the apartment, officers sought and obtained a search warrant for these items. The officers seized four computer devices, including a Dell Optiplex GX 620 computer hard drive ("Dell Computer"), and two digital cameras, including a gray Olympus camera ("Olympus Camera").

### C. M.I.'s Cause of Death Is Determined To Be Rickets, and a Grand Jury Indicts Snow-Ingram on Murder Charges.

¶8 Dr. Christopher Poulos, a pathologist with the Maricopa County Medical Examiner's Office, autopsied M.I.'s body to determine the cause and manner of her death. Dr. Poulos concluded that M.I.'s cause of death was rickets—a deficiency in vitamin D, calcium, or phosphorous that prevents bones from normally developing—from an unknown origin. But the manner of death was undetermined. Dr. Poulos later testified that other medical examiners agreed with his diagnosis. Dr. Jeffrey Johnston, the Chief Medical Examiner, agreed with Dr. Poulos that the cause of death was rickets of unknown origin and that the manner of M.I.'s death was undetermined.

¶9          In 2015, a grand jury indicted Snow-Ingram for first-degree murder, or in the alternative second-degree murder, and child abuse.  She pled not guilty.  Snow-Ingram then moved to dismiss the indictment, arguing the prosecution violated her right to free exercise of her religion. *See* Ariz. Const. art. 20, § 1; A.R.S. §§ 41-1493 to -1493.02.  The superior court denied the motion to dismiss.

### D.          Several Pre-Trial Evidentiary Motions Are Filed.

¶10          After several continuances, Snow-Ingram's trial was finally set for October 9, 2023.  Snow-Ingram and the State filed several evidentiary motions.

¶11          Snow-Ingram moved to suppress the statements she made to the police about her education before she was read her *Miranda* warnings. The superior court denied the motion, finding no *Miranda* violation.

¶12          The State moved to preclude Dr. Poulos' opinion testimony as to M.I.'s manner of death.  The State argued, and the court agreed, that Dr. Poulos' opinion as to the manner of death was based on statements from other witnesses and that his opinion would cause confusion because the five categories for manner of death in death certificates are not consistent with the elements of criminal offenses.  *See* A.R.S. § 11-594(A)(3), (5) (requiring medical examiners to certify cause and manner of death); *State v. Sosnowicz*, 229 Ariz. 90, 94 ¶ 12 (App. 2012) (explaining medical examiners typically utilize five categories to define manner of death).  The court affirmed its decision after Snow-Ingram made an offer of proof of this testimony at trial.

¶13          Snow-Ingram then moved for a special jury instruction on A.R.S. § 11-594(D), which provides that if there is a dispute over a medical examiner's report, the medical examiner, on an order from the court, must make available evidence and documents for a court-appointed forensic pathologist to review.  The court denied the motion.  Snow-Ingram also moved in limine to redact photos depicting handwritten messages hanging above where M.I. slept, which she contended contained inadmissible hearsay.  The State objected, arguing the statements were either non-hearsay or fell within an exception to hearsay.  The court denied Snow-Ingram's motion, finding the statements fell within exceptions to the rule against hearsay.

### E. Trial Begins, and Snow-Ingram Moves for Mistrial Based on Nondisclosure of Photos.

¶14            Trial began on October 9, 2023.  Ernest was scheduled to testify on October 17.  On October 16, Ernest texted defense counsel nine photos of pictures on a computer screen of M.I. alive, stating the photos were taken a week before she died, despite their being dated March 14, 2013, four months before her death.  Ernest explained that police released a Dell Computer to him in July 2023 and that he went to a Best Buy to have photos recovered from it.  Immediately after Ernest texted defense counsel, Snow-Ingram disclosed those nine photos from the Dell Computer to the State and the court.

¶15            On October 18, Snow-Ingram orally moved for mistrial based on the nine undisclosed photos from the Dell Computer, or in the alternative, a continuance and supplemented that oral motion with a writing on October 20.  She argued the nondisclosure violated *Brady v. Maryland*, 373 U.S. 87 (1963), Arizona Rule of Criminal Procedure 15.1, and her rights to due process under the United States and Arizona Constitutions.  U.S. Const. amend. VI, XIV; Ariz. Const. art. 2, §§ 4, 24.  The State moved to preclude the nine photos because half of the State's witnesses had already testified, the defense disclosure was too late, and the photos could not be authenticated.  The State also objected that the photos were immaterial under *Brady* and that it did not violate Arizona Rule of Criminal Procedure 15.1 because it had no intention of using any of the photos during trial.

¶16            On October 19, during trial, defense counsel interviewed Detective Roestenberg, who informed the defense that, despite the State's claim it had never searched any of the seized devices, the State obtained a warrant and had searched the Olympus Camera on August 7, 2023, recovering 1,149 photos.  Roestenberg confirmed the State had released the Dell Computer and other devices to Ernest, not retaining them as evidence, because the State's case file mistakenly failed to indicate Snow-Ingram was Ernest's co-defendant.  He also stated he learned photos of the children were on the Dell Computer because Ernest had told him so.

¶17            On October 21, the State filed a written opposition to Snow-Ingram's motion for mistrial.  The State attached its internal log of its document production, which was consistent with disclosing three things to Snow-Ingram on August 31:  ten pages of Bates-numbered materials regarding "Search Warrant 2023-037494," an unstated number of "Photos from SD Card," and an unstated number of "Files from Olympus Camera."

But the State did not provide a Rule 15.1(b)(5) disclosure and "concede[d] it has no evidence to suggest that defense actually received SW2023-037494, the supplement, or the images that were obtained prior to October 19, 2023." Snow-Ingram contended she did not receive the photos until October 19. Snow-Ingram supplemented her mistrial motion alleging that, after reviewing the Olympus Camera photos, she had found at least three more photos the defense "would have used in its opening statement and to corroborate its theory . . . [and] undermine the State's theory[.]" But none of those pictures depict M.I., and it is unclear when they were taken.

¶18        The superior court denied Snow-Ingram's motion for mistrial and request for a continuance, finding the State did not violate *Brady* or Rule 15.1. The court also granted the State's motion to preclude the photos disclosed by the defense.

### F.        The Jury Convicts Snow-Ingram and She Moves for a New Trial, Which Is Denied.

¶19        The presentation of the evidence concluded on October 31, 2023. The following day, the parties gave their closing arguments. The State objected during Snow-Ingram's closing argument after defense counsel stated that "multiple medical examiners . . . conferred on this case, and they agreed that the cause of death had nothing to do with starvation or malnutrition." The court sustained the objection because the statement did not accurately reflect Dr. Poulos' testimony. On November 6, the jury convicted Snow-Ingram of second-degree murder and intentional or knowing child abuse.

¶20        Snow-Ingram moved for a new trial, arguing the State failed to disclose evidence and to comply with Rule 15.1, the court "coerc[ed] a guilty verdict on second degree murder," and the court unreasonably restricted Snow-Ingram's closing argument. The court denied the motion without comment.

¶21        Snow-Ingram timely appealed. We have jurisdiction. *See* Ariz. Const. art. 6, § 9; A.R.S. § 13-4033(A)(1), (2).

## DISCUSSION

**I.** **The Superior Court Did Not Err by Denying Snow-Ingram's Motions for Mistrial and a New Trial Arising from the Late Disclosure of Photographs.**

**¶22** Snow-Ingram argues the State violated both *Brady* and Rule 15.1(b)(5) because it failed to retain the seized Dell Computer given to Ernest, which contained photos of M.I. alive, and disclose 1,149 photos from the Olympus Camera. Snow-Ingram contends the superior court erred by denying her (1) request for a continuance, (2) motion for mistrial and its supplement, and (3) motion for new trial, all of which arose from these alleged errors. As we next explain, she demonstrates no error.

### A. There Was No *Brady* Violation.

**¶23** Due process requires the prosecution to turn over any material evidence favorable to the defendant, even without any request from the defendant. *Brady*, 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 107 (1976). This includes evidence police investigators possess because prosecutors have a duty to learn of any favorable evidence the government possesses. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Thus, Snow-Ingram had to show: (1) the evidence was favorable; and (2) the State suppressed it; (3) prejudicing her. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Here, she failed to show prejudice.

**¶24** Snow-Ingram is correct that the State's nondisclosure, even if inadvertent because of internal errors in case indexing or otherwise, constitutes suppression under *Strickler*. *See id.* at 282. The State disclosed to the defense that it possessed the devices but had never searched any of them until August 7, 2023, when it obtained a search warrant for the Olympus Camera. *Brady* required the State to inform Snow-Ingram it searched the Olympus Camera to disclose the 1,149 recovered photos and to notify her that the devices released to Ernest, including the Dell Computer, likely contained photos of the children. *See id.* (failing to disclose known evidence is suppression). It did neither. As for the Dell Computer photos, the State learned the devices released to Ernest contained photos of the children in July 2023, when he requested their release and told officers the devices contained pictures of his children, but those photos were made available to Snow-Ingram only during trial by Ernest. *See Kyles*,

514 U.S. at 437-38 (holding prosecution responsible for nondisclosure of information known by police). And as to the Olympus Camera photos, the State conceded below that it had no evidence it produced them to her before October 19, 2023.

¶25        Despite those failures to disclose, the photographs were not favorable to Snow-Ingram, so she cannot demonstrate prejudice. She contends the photos could have been used to impeach State expert witnesses and support the defense's theory in the case, creating a "reasonable probability of a different result." *Id.* at 434. She argues photos directly rebut expert testimony that M.I. was in pain, M.I. could not sit up, she had targeted M.I. with abuse, and her apartment was not conducive to normal physical development. She also contends the photos support the defense's theories that she did not believe M.I. was ill and M.I. did not die from starvation.

¶26        But the photos of M.I. are neither favorable nor material. The Dell Computer photos show M.I. being held, her first birthday cake, and sitting up. Most significantly, the most recent photo of M.I. was taken four months before her death. These photos do not rebut expert testimony about M.I.'s condition at or around her death, that M.I. was not starved before her death, that Snow-Ingram did not abuse M.I., or that the condition of the apartment around M.I.'s death was not conducive to her physical and emotional development. The three Olympus Camera photos Snow-Ingram cites are of M.I.'s siblings, not M.I. They are neither favorable nor material because they are cumulative of other photos of M.I.'s siblings, and "the issues of whether [Snow-Ingram's] six other children were healthy and whether the home was appropriate . . . are not in dispute."

¶27        For these reasons, we find Snow-Ingram has not shown a *Brady* violation occurred.

### B.        Any Violation of Rule 15.1 Was Not Prejudicial.

¶28        Our analysis of Rule 15.1(b)(5) parallels our resolution of the *Brady* issue. Snow-Ingram contends the State's belated disclosure of the photos and the devices violated that rule. Ariz. R. Crim. P. 15.1(b)(5) (requiring State to make available to defendant, "a list of all . . . photographs . . . and electronically stored information the State intends to use at trial or that were obtained from or purportedly belong to the defendant[]"). The State has a continuing duty to disclose. Ariz. R. Crim. P. 15.6(a).

¶29        The State violated Rule 15.1(b)(5). Upon learning of the photos on the devices, Rule 15.1(b)(5) required the State to list them to

Snow-Ingram. As explained above, the State did not do so, partly because its case file mistakenly failed to reflect that Snow-Ingram was Ernest Ingram's co-defendant. But as we explained in Paragraph 26, the belatedly disclosed photos were not material to the defense.

¶30 Rule 15.7(b) commends the decision about whether to sanction a party for non-disclosure to the discretion of the superior court. *See State ex rel. Thomas v. Newell*, 221 Ariz. 112, 144 (App. 2009). Because Snow-Ingram was not prejudiced by the State's late disclosure of the materials, we find no abuse in discretion in not sanctioning the State. Snow-Ingram has not shown "no reasonable judge would have reached the same result under the circumstances." *State v. Armstrong*, 208 Ariz. 345, 354 ¶ 40 (2004); *see also State v. Jessen*, 130 Ariz. 1, 4 (1981) ("The choice of . . . no sanction for a violation of disclosure . . . will not be reversed on appeal absent a showing of prejudice."); Ariz. R. Crim. P. 15.7(b)(1) (stating court need not sanction for a discovery violation if violation is harmless). Indeed, the court's choice not to sanction on these facts is consistent with the purpose of *Brady*, which is to require the State to disclose favorable, material evidence to defendants. *See* 373 U.S. at 87.

### C. The Superior Court Did Not Err by Denying Snow-Ingram's Motion for New Trial.

¶31 Finally, because the State did not violate *Brady*, and it was not an abuse of discretion not to sanction the State under Rule 15.7 for its violation of Rule 15.1(b)(5), the superior court acted within its discretion in denying Snow-Ingram's motion for a new trial.

## II. The Trial Court Did Not Abuse Its Discretion by Precluding Photos.

¶32 Snow-Ingram argues the superior court erred by granting the State's motion to suppress the Dell Computer photos under Rule 15.7 because the photos were suppressed by the State. Our analysis follows our resolution of Snow-Ingram's other asserted issues concerning the photographs.

¶33 As a preliminary matter, we reject the State's argument that a lack of a timely offer of proof during trial waived Snow-Ingram's appellate arguments on this point. Snow-Ingram timely sought a continuance to evaluate the large number of photographs her counsel first received during trial. Snow-Ingram is right that her counsel could not have reasonably reviewed over 34,000 photos (the amount obtained during trial from the Dell Computer and the Olympus Camera combined) that quickly, so her

inability to do so is not waiver. *See State v. LaGrand*, 152 Ariz. 483, 487 (1987) (Constitutional waiver is an "intentional relinquishment or abandonment of a known right or privilege." (cleaned up)).

¶34        Her position fails, however, because even in her motion for new trial, filed after her counsel had time to review and analyze the photos, she was unable to demonstrate that any late-disclosed photo would have aided her defense, as discussed above. We review motions to preclude evidence as the result of a discovery violation for an abuse of discretion. *See State v. Naranjo*, 234 Ariz. 233, 243 ¶ 29 (2014). An abuse of discretion occurs only when "no reasonable judge would have reached the same result under the same circumstances." *Armstrong*, 208 Ariz. at 354 ¶ 40. Because the late-disclosed photographs were not significant, the superior court did not abuse its discretion in choosing not to sanction the State. Ariz. R. Crim. P. 15.7(c) ("In considering an appropriate sanction for nondisclosure or untimely disclosure, a court must determine the significance of the information not timely disclosed, the violation's impact on the overall administration of the case, the sanction's impact on the party and the victim, and the stage of the proceedings when the party ultimately made the disclosure.").

III.    **The Trial Court Did Not Abuse Its Discretion by Admitting Photos of Handwritten Messages.**

¶35        Snow-Ingram argues the superior court erred by admitting photos of handwritten messages that were hung above where M.I. slept and stated, "get well soon[,]" "I want to see you crawl on the ground," and "I'm glad you are one years old" because they are inadmissible hearsay. She also contends the admission of these messages violated her rights under the United States and Arizona Confrontation Clauses. *See* U.S. Const. amend. VI, XIV; Ariz. Const. art. 2, § 24. We disagree.

¶36        "We review a trial court's evidentiary decision for an abuse of discretion[.]" *State v. Smith*, 215 Ariz. 221, 232 ¶ 48 (2007). Although the superior court found the phrases to be admissible hearsay, we find the statements were not hearsay. *See State v. Carlson*, 237 Ariz. 381, 387 ¶ 7 (2015) (stating we will affirm a decision that is "legally correct for any reason" (quoting *State v. Perez*, 141 Ariz. 459, 464 (2015))). The messages were not offered for the truth of the matter asserted—that the declarant genuinely wished M.I. would get well soon, genuinely wanted her to crawl, or genuinely was glad she was one year old. Instead, they were offered as circumstantial evidence that M.I. was, or appeared, ill and thus Snow-Ingram was on notice of M.I.'s illness. *See State v. Chavez*, 225 Ariz. 442, 443

¶ 9 (App. 2010) (Text messages sent to defendant asking for drugs were not hearsay because "they were offered as circumstantial evidence that [defendant] had drugs for sale."). Because the statements are not hearsay, they are admissible, and there is no Confrontation Clause violation. *See State v. Boggs*, 218 Ariz. 325, 334 ¶ 32 (2008) (quoting *Smith*, 215 Ariz. at 229 ¶ 26)).

## IV. The Superior Court Did Not Abuse Its Discretion by Excluding Dr. Poulos' Testimony About M.I.'s Manner of Death.

¶37        Snow-Ingram argues the superior court abused its discretion by limiting Dr. Poulos' testimony to exclude his opinion on M.I.'s manner of death. We review the superior court's rulings on expert testimony for an abuse of discretion. *See Cruz v. Blair*, 255 Ariz. 335, 343 ¶ 27 (2023). We find no error.

¶38        In *State v. Sosnowicz*, we held that "when . . . the medical examiner's opinion regarding the manner of death is based largely on the testimony of lay witnesses whose credibility the jury can determine without the aid of expert testimony, an expert's opinion regarding the manner of death would normally be inadmissible." 229 Ariz. at 97-98 ¶ 26. The superior court, relying on *Sosnowicz*, precluded Dr. Poulos' manner of death testimony under Arizona Rules of Evidence 703 and 403 because he "relied primarily" on statements from other witnesses that would be testifying at trial, and the opinion was highly prejudicial and outweighed the probative value. But the superior court did permit Dr. Poulos to testify as to the cause of death, which he stated was rickets or "[c]omplications of metabolic bone disease of undetermined etiology[.]" In other words, the court limited his testimony only to preclude him from opining about whether M.I.'s death was a homicide—the ultimate question for the jury in this case. Because Dr. Poulos' report relies on reports from Snow-Ingram, Ernest, M.I.'s siblings, and reports from the day M.I. died, and it would prejudice the jury were he led to instruct the jury how to decide the case, we find no abuse of discretion. *See id.* at 97 ¶ 25 ("[A]n expert is not permitted to tell a jury how to decide a case.").

## V. The Superior Court Did Not Err by Denying Snow-Ingram's Request for a Special Instruction.

¶39        Snow-Ingram argues the court erroneously denied her request for a special jury instruction regarding the State's ability to seek an independent examination from a medical examiner. She moved for a special jury instruction on A.R.S. § 11-594(D), which provides that if a

dispute arises over a medical examiner's findings, the medical examiner, on an order of the court, shall make available all evidence and documents for a court-designed forensic pathologist to review. Snow-Ingram contends that because the parties disagree as to Dr. Poulos' findings and "[t]here was no evidence presented to indicate that the State availed itself of this statute[,]" she is entitled to a jury instruction on the statute. Not so.

¶40    We generally review a court's denial of a jury instruction for an abuse of discretion. *State v. Anderson*, 210 Ariz. 327, 344 ¶ 60 (2005). "A party is entitled to an instruction on any theory reasonably supported by the evidence." *State v. Rodriguez*, 192 Ariz. 58, 61 ¶ 16 (1998). Arizona Revised Statute § 11-594 is a civil statute, which provides the "[p]owers and duties of county medical examiner[s]" and does not reference the criminal system. Even assuming Snow-Ingram could request this instruction, she does not argue the instructions given do not adequately reflect the law; rather, she contends she "would have used this instruction in closing argument to argue that the State had not met its burden of proof." *See Rodriguez*, 192 Ariz. at 61 ¶ 16 (The ultimate question is "whether the instructions adequately set forth the law applicable to the case."). Even so, the standard burden of proof instructions properly placed the burden on the State to prove Snow-Ingram's guilt, thus, the superior court did nor err when it refused to give the special instruction. *Cf. id.* at 63 ¶¶ 26-27 (Failure to give alibi instruction was reversible error because "standard burden of proof instructions do not redress the risk of burden shifting engendered by alibi evidence[.]"). Accordingly, the court did not abuse its discretion by denying this particular instruction.

## VI.    The Superior Court Did Not Abuse Its Discretion by Refusing to Allow Dr. Johnston to Testify.

¶41    Snow-Ingram argues the superior court abused its discretion by precluding Dr. Johnston, a defense expert and Maricopa County Medical Examiner's Office Chief Medical Examiner, to testify as to M.I.'s cause of death. The superior court prevented Dr. Johnston from testifying to the cause of M.I.'s death because it would have been cumulative of Dr. Poulos' testimony. *See* Ariz. R. Evid. 403 (stating court may exclude needlessly cumulative evidence). Snow-Ingram contends Dr. Johnston's testimony was admissible and would not have been cumulative because (1) he formed an opinion as to M.I.'s lack of ketoacidosis and (2) the State had two experts opine as to cause of death, which it emphasized in closing argument. We disagree.

¶42    As an initial matter, Snow-Ingram never called Dr. Johnston to testify at trial nor made an offer of proof of his testimony. *See* Ariz. R. Evid. 103(a)(2). Nonetheless, the superior court's ruling expressly permitted Snow-Ingram to call him to testify as to his opinion on his ketoacidosis findings. And Snow-Ingram failed to object to the State's experts' allegedly cumulative expert testimony and does not attempt to argue the court's admission of the testimony was error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 20 (2005). Thus, we find no abuse of discretion. *See Cruz*, 255 Ariz. at 343 ¶ 27; *State v. Cooperman*, 232 Ariz. 347, 351 ¶ 17 (2013) (stating the superior court has "considerable discretion" in making 403 determinations).

## VII.    The Superior Court Did Not Abuse Its Discretion When It Sustained an Objection During Closing Argument.

¶43    Snow-Ingram contends the superior court unfairly and erroneously restricted her closing argument. In closing argument, defense counsel stated Dr. Poulos conferred with other medical examiners and that "they agreed that the cause of death had nothing to do with starvation or malnutrition." The State objected, and the court agreed, that defense counsel misstated Dr. Poulos' testimony. We agree with the superior court.

¶44    Dr. Poulos testified that his pathologic diagnoses for M.I. were "complications of bone disease," "[f]ailure to thrive," no "recent significant injuries[,]" and that tests for metabolic abnormalities were negative. He also testified that doctors in the medical examiner's office, "concurred with [his] diagnosis." Though Dr. Poulos also testified that "[his] medical opinion was [M.I.] was not starved to death," he did not testify that others concurred in that opinion. As such, the court did not abuse its discretion in sustaining the objection. *See State v. Johnson*, 247 Ariz. 166, 182 ¶ 22-25 (2019) (holding superior court did not err by limiting defense counsel's closing argument).

## VIII.    The Superior Court Did Not Abuse Its Discretion in Its Rulings on the Police Interview Statements and Video.

¶45    As to her July 13, 2013 police interview, Snow-Ingram argues the court erred by denying her: (1) motion to suppress pre-*Miranda* statements; and (2) request to redact part of the interview video, which occurred after she received *Miranda* warnings. We review evidentiary rulings for an abuse of discretion. *Boggs*, 218 Ariz. at 334 ¶ 38. We find no error.

¶46          *First*, Snow-Ingram's pre-*Miranda* statements were not obtained in violation of *Miranda*. 382 U.S. at 436. After agreeing to be interviewed at police headquarters, she was placed into an interrogation room and asked about her education. In response, she stated she was enrolled in a five-year college program and studied mechanical engineering. Immediately after being asked about her education, she was read her *Miranda* warnings. Assuming Snow-Ingram was "in custody," she cannot demonstrate her statements were in response to police interrogation. *See State v. Zamora*, 220 Ariz. 63, 67-68 ¶ 10 (App. 2009) (proving a *Miranda* violation requires defendant to show he was "in custody" and was not read *Miranda* warnings before police began a "custodial interrogation[]"). The question about Snow-Ingram's education at the start of the interview did not constitute "words . . . on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (defining "interrogation" under *Miranda*). Although Snow-Ingram is correct Calderon wanted to know her level of knowledge and later used her education to interrogate her, we find no abuse of discretion and agree with the superior court that "[t]he questions asked are questions that would reasonably be asked of a person to determine his/her ability to understand the conversation." *See State v. Waggoner*, 139 Ariz. 443, 445-46 (App. 1983) ("Ordinarily, the routine gathering of background biographical data will not constitute interrogation." (quoting *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981))).

¶47          *Second,* the court did not abuse its discretion by denying Snow-Ingram's request to redact part of the interview video. Snow-Ingram asked the court to redact the following remarks by Calderon:

> I know it's hard to be a stay-at-home mother, but to be a good stay-at-home mother, you have to realize that the child was not healthy. You have enough education in your life to know right and wrong, especially if you're going to school to be an engineer. That means you're a very smart person, a very smart person. And for you to sit here -- me to sit here in front of you and you to tell me there's nothing wrong with that child, I feel like you are lying to me . . . . She looked like a premature baby now and she's 15 months old.

¶48          Snow-Ingram contends the statements impermissibly allow Calderon to testify as to her credibility and constitute a lay witness' opinion on the ultimate issue. But these statements accusing her of being untruthful were a part of Calderon's interrogation technique, provided context to the

interrogation, and were not being offered as opinion testimony at trial. *See Boggs*, 218 Ariz. at 335 ¶ 40 (collecting cases). To be sure, she also argues such statements did not provide context because she did not respond to the allegations by Calderon and use of the video would violate her right to remain silent under *Miranda*. But Snow-Ingram never invoked her right to remain silent. *See State v. Szpyrka*, 220 Ariz. 59, 61-62 ¶ 5 (App. 2008) (explaining invocation of the right to remain silent must be clear and unambiguous). Thus, we find no error.

## IX. The Superior Court Did Not Err by Denying Snow-Ingram's Motion to Dismiss on the Basis of the Free Exercise Clause.

**¶49**     Snow-Ingram argues the superior court erred by denying her motion to dismiss the indictment because it violated her right to the free exercise of her religion. *See* Ariz. Const. art. 20, § 1; A.R.S. §§ 41-1493 to -1493.02 ("Free Exercise of Religion Act" or "FERA"). Specifically, she contends she was entitled to use spiritual treatment and home remedies and to refuse non-emergent medical treatment for her children, because the decision was rooted in her religious belief.

**¶50**     We review constitutional and statutory issues de novo. *Boggs*, 218 Ariz. at 333 ¶ 25; *State v. Hardesty*, 222 Ariz. 363, 365 ¶ 7 (2009). Assuming Snow-Ingram's conduct was motivated by her sincerely held religious beliefs, she cannot demonstrate that the murder and child abuse prosecution substantially burdens the free exercise of her religion. *See Hardesty*, 222 Ariz. at 366 ¶ 10 (stating, under FERA, burden is on party asserting violation to show an act motivated by religious belief, that the belief is sincerely held, and the government action substantially burdens the exercise of her beliefs). She has failed to demonstrate the prosecution for murder and child abuse substantially burdens her religious practice because she was not being forced, under threat of criminal sanction, to act in a manner inconsistent with her religious beliefs. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 440 (1988) (holding that government action did not violate individuals' free exercise of religion where "affected individuals would not be coerced by the Government's action into violating their religious beliefs"). To the contrary, prosecution for failing to seek medical intervention when a child is deathly ill is consistent with the belief she expressed in spiritual treatment and home remedies in the absence of an emergency, given that M.I.'s condition was an emergency. We find no error.

## CONCLUSION

¶51        We affirm.



MATTHEW J. MARTIN • Clerk of the Court

**FILED**:         JR